## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------  x
In re:                                             :   Chapter 11
                                                   :
Dayton Superior Corporation,¹                      :   Case No. 09-11351-BLS
a Delaware corporation,                            :
                                                   :
         Debtor.                                   :
-------------------------------------------------  x
```

---

## DISCLOSURE STATEMENT FOR
## THE FIRST AMENDED PLAN OF REORGANIZATION FOR
## DAYTON SUPERIOR CORPORATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

| | |
|---|---|
| **RICHARDS, LAYTON & FINGER, P.A.** | **LATHAM & WATKINS LLP** |
| Russell C. Silberglied (Bar. No. 3462) | Keith. A. Simon |
| John H. Knight (Bar No. 3848) | Jude M. Gorman |
| Paul N. Heath (Bar No. 3704) | Joseph S. Fabiani |
| Lee E. Kaufman (Bar No. 4877) | 885 Third Avenue |
| One Rodney Square | New York, New York 10022 |
| 920 North King Street | Telephone:  (212) 906-1200 |
| Wilmington, Delaware 19801 | Facsimile:  (212) 751–4864 |
| Telephone:  (302) 651-7700 | |
| Facsimile:  (302) 651-7701 | |

Co-Counsel for the Debtor and Debtor in Possession

Dated:  August 25, 2009

---

¹  The last four digits of the Debtor's federal tax identification number are:  EIN: XX-XXX6346.  The Debtor's mailing address is 7777 Washington Village Dr., Suite 130, Dayton, Ohio 45459.

**THE VOTING DEADLINE IS 5:00 P.M. PREVAILING PACIFIC TIME ON OCTOBER 1, 2009** (UNLESS THE DEBTOR EXTENDS THE VOTING DEADLINE).

TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, THE VOTING AND CLAIMS AGENT MUST <u>ACTUALLY RECEIVE</u> YOUR BALLOT, PRE-VALIDATED BENEFICIAL HOLDER BALLOT OR MASTER BALLOT, AS APPLICABLE, ON OR BEFORE THE VOTING DEADLINE.

BENEFICIAL HOLDERS RECEIVING BENEFICIAL HOLDER BALLOTS THAT ARE <u>NOT</u> PRE-VALIDATED MUST RETURN SUCH BENEFICIAL HOLDER BALLOTS TO THEIR RESPECTIVE INTERMEDIARY RECORD OWNERS AS SOON AS POSSIBLE TO ALLOW SUFFICIENT TIME FOR INTERMEDIARY RECORD OWNERS TO VALIDATE AND INCLUDE THEIR VOTES ON A MASTER BALLOT AND RETURN SUCH MASTER BALLOTS TO THE VOTING AND CLAIMS AGENT ON OR BEFORE THE VOTING DEADLINE.

---

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED HERETO IS SPECULATIVE, AND SUCH DOCUMENTS SHOULD NOT BE RELIED UPON IN MAKING INVESTMENT DECISIONS WITH RESPECT TO THE DEBTOR OR ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THE CHAPTER 11 CASE.

---

**PRESERVATION OF AVOIDANCE ACTIONS UNDER THE PLAN:**

IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINST, OR TO OBJECT TO CONFIRMATION OF, THE PLAN, CREDITORS AND INTEREST HOLDERS SHOULD BE AWARE THAT THE PLAN PRESERVES ALL CAUSES OF ACTION (INCLUDING AVOIDANCE ACTIONS) AND THAT THE PLAN AUTHORIZES THE REORGANIZED DEBTOR TO PROSECUTE THE SAME.

## IMPORTANT INFORMATION FOR YOU TO READ

THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, AND WILL INSTEAD RELY UPON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(2) OF THE SECURITIES ACT OR OTHER APPLICABLE EXEMPTIONS.   THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTOR URGES EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.   FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTOR'S POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE DEBTOR OR THE REORGANIZED DEBTOR MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTOR'S CHAPTER 11 CASE AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT. THE DEBTOR DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTOR'S MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTOR HAS USED ITS REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS EXPRESSLY PROVIDED HEREIN).

THE DEBTOR IS GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED. THE DEBTOR HAS NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

**HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTOR AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN SECTION VI HEREIN, "PLAN-RELATED RISK FACTORS."**

**TABLE OF CONTENTS**

Page

I.   EXECUTIVE SUMMARY ................................................................................................ i

   A.   Purpose and Effect of the Plan ........................................................................... ii

   B.   Administrative, DIP Facility and Priority Tax Claims ....................................... iv

   C.   Classification and Treatment of Claims and Interests Under the Plan ............... iv

   D.   Solicitation Procedures ...................................................................................... vii

   E.   Voting Procedures ............................................................................................. xi

   F.   Confirmation of the Plan ................................................................................... xiv

   G.   Consummation of the Plan ................................................................................ xv

   H.   Risk Factors ...................................................................................................... xv

II.  BACKGROUND TO THE CHAPTER 11 CASE ........................................................ 1

   A.   The Debtor's Corporate History and Structure .................................................. 1

   B.   Overview of the Debtor's Business .................................................................... 1

   C.   Prepetition Indebtedness ................................................................................... 2

   D.   Events Leading to the Chapter 11 Filing ........................................................... 3

III. EVENTS DURING THE CHAPTER 11 CASE ......................................................... 4

   A.   First Day Motions and Certain Related Relief ................................................... 4

   B.   The Official Committee of Unsecured Creditors ................................................ 6

   C.   Filing of the Schedules and Establishment of the Claims Bar Date ................... 6

   D.   Reorganization Strategy .................................................................................... 7

   E.   Exclusive Period for Filing a Plan and Soliciting Votes .................................... 7

   F.   Deadline to Assume or Reject Leases of Nonresidential Real Property ............. 7

   G.   Summary of Exit Facilities ................................................................................ 8

IV.   SUMMARY OF THE PLAN ........................................................................................................9

    A.   Administrative, DIP Facility and Priority Tax Claims ...........................................................9

    B.   Classification and Treatment of Classified Claims and Equity Interests................................10

    C.   Acceptance or Rejection of the Plan ....................................................................................15

    D.   Means for Implementation of the Plan .................................................................................16

    E.   Treatment of Executory Contracts and Unexpired Leases ....................................................22

    F.   Provisions Governing Distributions .....................................................................................25

    G.   Procedures for Resolving Contingent, Unliquidated and Disputed Claims............................29

    H.   Conditions Precedent to Confirmation and Consummation of the Plan .................................30

    I.   Release, Injunction And Related Provisions ........................................................................31

    J.   Binding Nature of the Plan..................................................................................................34

V.   CONFIRMATION AND CONSUMMATION PROCEDURES...................................................35

    A.   Solicitation of Votes...........................................................................................................35

    B.   Confirmation Procedures.....................................................................................................35

    C.   Statutory Requirements for Confirmation of the Plan ..........................................................35

    D.   Consummation of the Plan ..................................................................................................40

VI.   PLAN-RELATED RISK FACTORS .........................................................................................41

    A.   Certain Bankruptcy Law Considerations..............................................................................41

    B.   Risk Factors That May Affect the Value of Securities to be Issued Under the Plan and/or Recoveries Under the Plan ..................................................................................................43

    C.   Risk Factors that Could Negatively Impact the Debtor's Business........................................44

    D.   Risks Associated with Forward Looking Statements ............................................................47

    E.   Disclosure Statement Disclaimer.........................................................................................48

VII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...........................51

    A.   Liquidation Under Chapter 7 of the Bankruptcy Code..........................................................51

    B.   Filing of an Alternative Plan of Reorganization...................................................................51

**VIII. EXEMPTIONS FROM SEC URITIES ACT REGISTRATION** .................................................................52

    Section 1145 of the Bankruptcy Code and Section 4(2) of the Securities Act ...................................................52

**IX.**    **CERTAIN U.S. FEDERAL INCOME  TAX CONSEQUENCES OF THE PLAN** ...................................54

    A.    Certain U.S. Federal Income Tax Consequences to Holders of Allowed Prepetition Term Loan Credit Facility Claims, Holders of Allowed Subordinated Notes Claims and Holders of Allowed General Unsecured Claims ...........................................................................................................55

    B.    Certain U.S. Federal Income Tax Consequences to Reorganized Debtor ..............................................58

**RECOMMENDATION** ............................................................................................................................................61

## EXHIBITS

| | |
|---|---|
| EXHIBIT A | First Amended Plan of Reorganization |
| EXHIBIT B | Disclosure Statement Order |
| EXHIBIT C | The Reorganized Debtor's Financial Projections |
| EXHIBIT D | The Reorganized Debtor's Valuation Analysis |
| EXHIBIT E | Liquidation Analysis |
| EXHIBIT F | Historical Financial Statements |

THE DEBTOR HEREBY ADOPTS AND INCORPORATES EACH EXHIBIT ATTACHED TO
THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

# I.
# EXECUTIVE SUMMARY

Dayton Superior Corporation ("**Dayton Superior**"), a Delaware corporation with its primary headquarters in Dayton, Ohio, as debtor and debtor-in-possession (the "**Debtor**"), submits this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes on the First Amended Plan of Reorganization for Dayton Superior Corporation Under Chapter 11 of the Bankruptcy Code dated August 25, 2009 (the "**Plan**"),[2] which was filed by the Debtor with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").   The Confirmation Hearing on the Plan is scheduled to commence at 1:30 p.m. prevailing Eastern Time on October 14, 2009 before the Bankruptcy Court.  A copy of the Plan is attached hereto as Exhibit A.

Prior to soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization.  As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

This Executive Summary is being provided as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (and including all exhibits attached hereto and to the Plan), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan.  This Disclosure Statement includes, without limitation, information about:

- the Debtor's prepetition operating and financial history;

- the events leading up to the commencement of the Chapter 11 Case;

- the significant events that have occurred during the Chapter 11 Case;

- the solicitation procedures for voting on the Plan;

- the Confirmation process and the voting procedures that Holders of Claims who are entitled to vote on the Plan must follow for their votes to be counted;

- the terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain risk factors relating to the Debtor or the Reorganized Debtor, the Plan and the securities to be issued under the Plan and the manner in which distributions will be made under the Plan; and

- the proposed organization, operations and financing of the Reorganized Debtor if the Plan is confirmed and becomes effective.

---

[2]  All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

i

A. **PURPOSE AND EFFECT OF THE PLAN**

 1. **Plan of Reorganization Under Chapter 11 of the Bankruptcy Code**

 The Debtor is reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. As a result, the confirmation of the Plan means that the Reorganized Debtor will continue to operate its business going forward and does not mean that the Debtor will be liquidated or forced to go out of business. Additionally, as discussed in greater detail in Section IV.J herein, titled "Binding Nature of the Plan," a bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such Entity voted on the Plan or affirmatively voted to reject the Plan.

 2. **Financial Restructurings Under the Plan**

 The Plan contemplates certain transactions, including, without limitation, the following transactions (described in greater detail in Section IV herein):

- the Debtor's $170 million Subordinated Notes will be converted into 100% of the New Stock of the Reorganized Debtor, subject to dilution for the Rights Offering and the Equity Incentive Program;

- the Debtor will commence a $100 million Rights Offering of New Stock, and the Rights Offering Participants will receive Subscription Rights in the Rights Offering;

- the recipients of New Stock pursuant to the Plan and the Rights Offering will contribute their shares of New Stock in exchange for their pro rata share of equity interests in Holdings, and Holdings will contribute its shares of New Stock to Intermediate Holdings in exchange for all equity interests in Intermediate Holdings.

- the Reorganized Debtor will enter into the $110 million Revolver Exit Facility;

- the DIP Facility will be satisfied in full in Cash on the Effective Date;

- the Prepetition Term Loan Credit Facility will be satisfied in full by (i) the Prepetition Term Loan Payment Amount and (ii) notes issued in connection with the Term Loan Exit Facility; and

- the Holders of other Claims and Equity Interests will receive the treatment summarized in Section IV.B.2 below.

 The Debtor believes that consummation of the financial restructurings proposed under the Plan will simplify and de-lever its capital structure, provide sufficient liquidity to fund its emergence from chapter 11, appropriately capitalize the Reorganized Debtor and facilitate the implementation of the Debtor's business plan.

 (a) Satisfaction of the DIP Facility and Entry into the Revolver Exit Facility

 On the Effective Date, the DIP Facility will be satisfied in full in Cash, and the Debtor will enter into the Revolver Exit Facility. The Revolver Exit Facility will provide the Debtor the funds necessary to, among other things, make payments under the Plan and conduct its post-reorganization operations. The Revolver Exit Facility will be secured by liens on and security interests in substantially all of the Debtor's assets, with priorities as set forth in the Term Loan Exit Intercreditor Agreement. The terms of the Revolver Exit Facility are summarized in Section III.G herein and the Revolver Exit Facility Term Sheet.

(b)     Satisfaction of Prepetition Term Loan Credit Facility Claims and Entry into Term Loan Exit Facility

On the Effective Date, the Prepetition Term Loan Credit Agreement and all "Loan Documents" as defined therein will be replaced (or amended and restated) by the Term Loan Exit Facility Credit Agreement and all "Loan Documents" as defined therein. The Prepetition Term Loan Credit Facility Claims will be satisfied by (i) the Prepetition Term Loan Payment Amount and (ii) the notes issued in connection with the Term Loan Exit Facility. The Term Loan Exit Facility will be secured by liens on and security interests in substantially all of the Debtor's assets, with priorities as set forth in the Term Loan Exit Intercreditor Agreement. The terms of the Term Loan Exit Facility are summarized in Section III.G herein and the Term Loan Exit Facility Term Sheet.

(c)     New Stock To be Issued Under the Plan

On the Effective Date, the Reorganized Debtor will issue the New Stock to Holders of Allowed Subordinated Note Claims pursuant to the terms set forth in the Plan. The New Stock will represent all of the equity interests in the Reorganized Debtor as of the Effective Date and will be subject to dilution as a result of the Rights Offering. After giving effect to the Restructuring Transactions, the recipients of New Stock will become the holders of the Post-Effective Date Equity Interests, which will be subject to dilution by any equity issued in connection with the Equity Incentive Program. The Reorganized Debtor will not be obligated to list the New Stock on a national securities exchange, nor will Holdings be obligated to list the Post-Effective Date Equity Interests on a national securities exchange. The New Stock and the Post-Effective Date Equity Interests will be issued without registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Section VIII herein, titled "Exemptions From Securities Act Registration."

(d)     The Rights Offering

On the Subscription Commencement Date (which is the date to occur as soon as possible after entry of the Disclosure Statement Order), the Debtor will commence a $100 million Rights Offering of shares of New Stock in the Reorganized Debtor, which will be offered to each Rights Offering Participant. Pursuant to the Rights Offering, each Rights Offering Participant may subscribe for its Pro Rata Share of the Rights Offering Shares. Pursuant to the Backstop Rights Purchase Agreement, the Backstop Parties have committed to purchase all Rights Offering Shares offered, but not otherwise purchased, in the Rights Offering.

(e)     Equity Incentive Program for Directors and Management

Following the Effective Date, Holdings will adopt and implement a post-Effective Date director and officer equity incentive program providing for the issuance from time to time, as approved by the board of managers of Holdings, of Post-Effective Date Equity Interests representing, in the aggregate, up to ten percent (10%) of the common equity interests of Holdings, on a fully-diluted basis, as of the Effective Date.

**3.      Restructuring Transactions**

In connection with the restructuring contemplated by the Plan, the Reorganized Debtor will consummate the following Restructuring Transactions on the Effective Date (without limitation to other restructuring transactions that the Reorganized Debtor may effectuate prior to, on or subsequent to the Effective Date, on notice to the Bankruptcy Court):

- First Contribution: Immediately following the issuance of New Stock, the holders of any shares of New Stock will be required to contribute such shares of New Stock to Holdings in exchange for such holders' respective pro rata shares of (i) Class A Preferred Units and (ii) Class A Common Units in Holdings.

- Second Contribution:  Immediately following the First Contribution, Holdings will contribute the New Stock to Intermediate Holdings in exchange for 100% of the Intermediate Holdings Common Stock.

For a more detailed discussion of the Restructuring Transactions please see Section IV.D herein, titled "Means for Implementation of the Plan."

**B.      ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS**

The following is a summary of the treatment of Administrative, DIP Facility and Priority Tax Claims under the Plan.  For a more detailed description of the treatment of such Claims under the Plan, please see Article II of the Plan.

**1.      Administrative Claims**

Except as otherwise provided in Article II of the Plan, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash for the unpaid portion of such Allowed Administrative Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or Reorganized Debtor, as applicable, and such Holder; provided, however, that Administrative Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtor or Reorganized Debtor without further notice to or order of the Bankruptcy Court.

**2.      DIP Facility Claims**

Unless otherwise agreed to by the DIP Lenders, the Allowed DIP Facility Claims will be paid in full in Cash on the Effective Date in full satisfaction, settlement, discharge and release of, and in exchange for, such DIP Facility Claims.

**3.      Priority Tax Claims**

Except as otherwise provided in Article II of the Plan and as more fully described in Section IV.A.3 hereof, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor or Reorganized Debtor: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) such other less favorable treatment as agreed to in writing by the Debtor or Reorganized Debtor, as applicable, and such Holder; provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (c) installment Cash payments pursuant to and in accordance with sections 1129(a)(9)(C) and (D) of the Bankruptcy Code.

**C.      CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

The following table provides a summary of the classification and treatment of Claims and Equity Interests and the potential distributions to Holders of Allowed Claims and Equity Interests under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTOR'S CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN ARTICLE VI BELOW.  THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY.  FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS**

**COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW.**

v

## SUMMARY OF EXPECTED RECOVERIES

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 1 | Other Priority Claims<br><br>Expected Amount: $0 | Each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim:<br><br>• Cash in an amount equal to the amount of such Allowed Other Priority Claim;<br><br>• Such other less favorable treatment as to which the Debtor or Reorganized Debtor and the Holder of such Allowed Other Priority Claim shall have agreed upon in writing; or<br><br>• Such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code. | 100% |
| 2 | Other Secured Claims<br><br>Expected Amount: $0 | Each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:<br><br>• Cash in an amount equal to the amount of such Other Secured Claim;<br><br>• Such other less favorable treatment as to which the Debtor or Reorganized Debtor and the Holder of such Allowed Other Secured Claim shall have agreed upon in writing; or<br><br>• Such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code. | 100% |
| 3 | Secured Tax Claims<br><br>Expected Amount: $0 | Each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim:<br><br>• Cash in an amount equal to the amount of such Allowed Secured Tax Claim;<br><br>• Cash in an amount agreed to by the Debtor or the Reorganized Debtor, as applicable, and such Holder; provided, however, that such parties may further agree for the payment of such Allowed Secured Tax Claim at a later date; or<br><br>• at the option of the Debtor or the Reorganized Debtor, as applicable, and in accordance with section 1129(a)(9)(C) and (D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Secured Tax Claim payable in regular installment payments over a period ending not more than five years after the Petition Date. | 100% |
| 4 | Prepetition Term Loan Credit Facility Claims<br><br>Expected amount: Approximately $103,152,385, plus reasonable fees and expenses and accrued postpetition interest (calculated at the rate provided for in the Term Loan Exit Facility Term Sheet) | Each Holder of an Allowed Class 4 Claim will receive its Pro Rata share of (i) the Prepetition Term Loan Payment Amount and (ii) the notes issued in connection with the Term Loan Exit Facility, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 4 Claim. | 100% |
| 5 | Subordinated Note Claims<br><br>Expected Amount: Approximately $161,636,231 | Each Holder of an Allowed Class 5 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 5 Claim, its Pro Rata share of the New Stock which will be subject to dilution as a result of the Rights Offering and, after giving effect to the Restructuring Transactions, the Equity Incentive Program. | 19.0% |

vi

**SUMMARY OF EXPECTED RECOVERIES**

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 6 | General Unsecured Claims<br><br>Expected Amount: Approximately $8,936,000 | Each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 6 Claim,<br><br>• its Pro Rata share of the General Unsecured Claims Cash Amount of $1,787,323; or<br><br>• Such other less favorable treatment as to which the Debtor or Reorganized Debtor and the Holder of such Allowed General Unsecured Claim shall have agreed upon in writing. | 20.0% |
| 7 | Junior Convertible Notes Claims<br><br>Expected Amount: Approximately $1,028,870 | Junior Convertible Notes Claims will be deemed canceled and will be of no further force and effect, whether surrendered for cancellation or otherwise, and the Holders of such Junior Convertible Notes Claims will not receive any distribution or retain any property on account of such Junior Convertible Notes Claims. | 0% |
| 8 | Equity Interests | Equity Interests will be deemed canceled and will be of no further force and effect, whether surrendered for cancellation or otherwise, and the Holders of such Equity Interests will not receive any distribution or retain any property on account of such Equity Interests. | 0% |

## D.    SOLICITATION PROCEDURES

### 1.    The Solicitation and Voting Procedures

On August 25, 2009 the Bankruptcy Court entered the Disclosure Statement Order which, among other things, (a) approved the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the Plan, as well as certain vote tabulation procedures and (b) established the deadline for filing objections to the Plan and scheduling the hearing to consider confirmation of the Plan.

**The discussion of the procedures below is a summary of the solicitation and voting process.** Detailed voting instructions will be provided with each Ballot, Beneficial Holder Ballot and Master Ballot, as applicable, and are also set forth in greater detail in Disclosure Statement Order.

PLEASE REFER TO THE INSTRUCTIONS ACCOMPANYING THE BALLOTS, BENEFICIAL HOLDER BALLOTS AND MASTER BALLOTS, AS APPLICABLE, AND THE DISCLOSURE STATEMENT ORDER FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT YOUR BALLOT, BENEFICIAL HOLDER BALLOT OR MASTER BALLOT, AS APPLICABLE, IS PROPERLY AND TIMELY SUBMITTED SUCH THAT YOUR VOTE MAY BE COUNTED.

### 2.    The Voting and Claims Agent

With the approval of the Bankruptcy Court, the Debtor retained Kurtzman Carson Consultants LLC to, among other things, act as Voting and Claims Agent.

Specifically, the Voting and Claims Agent will assist the Debtor with: (a) mailing Confirmation Hearing Notices (as defined in the Disclosure Statement Order), (b) mailing Solicitation Packages (as defined in the Disclosure Statement Order and as described below), (c) soliciting votes on the Plan, (d) receiving, tabulating, and reporting on ballots cast for or against the Plan by holders of claims against the Debtor, (e) responding to inquiries from creditors and stakeholders relating to the Plan, the Disclosure Statement, the ballots and matters related thereto,

RLF1-3427156-2
NY\1558715.7

including, without limitation, the procedures and requirements for voting to accept or reject the Plan and objecting to the Plan, and (f) if necessary, contacting creditors regarding the Plan and their Ballots.

    3.      **Holders of Claims Entitled to Vote on the Plan**

        Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan. The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder of a Claim within such Class) under the Plan:

| Class | Claim/Equity Interest | Status | Voting Rights |
|-------|-----------------------|--------|---------------|
| **SUMMARY OF STATUS AND VOTING RIGHTS** | | | |
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Secured Tax Claims | Unimpaired | Deemed to Accept |
| 4 | Term Loan Facility Claims | **Impaired** | **Entitled to Vote** |
| 5 | Subordinated Note Claims | **Impaired** | **Entitled to Vote** |
| 6 | General Unsecured Claims | **Impaired** | **Entitled to Vote** |
| 7 | Junior Convertible Notes Claims | Impaired | Deemed to Reject |
| 8 | Equity Interests | Impaired | Deemed to Reject |

        Based on the foregoing, the Debtor **is** soliciting votes to accept the Plan only from Holders of Claims in Classes 4, 5 and 6 (collectively, the "**Voting Classes**") because Holders of Claims in the Voting Classes are Impaired under the Plan and, therefore, have the right to vote to accept or reject the Plan. The Debtor is **not** soliciting votes from (a) Holders of Unimpaired Claims in Classes 1, 2 and 3 because such parties are conclusively presumed to have accepted the Plan or (b) Holders of Claims in Class 7 and Equity Interests in Class 8 because such parties are conclusively presumed to have rejected the Plan (collectively, the "**Non-Voting Classes**").

    4.      **The Voting Record Date**

        **The Bankruptcy Court has approved August 10, 2009 as the Voting Record Date with respect to Claims in Classes 5, 7 and 8, and has approved August 25, 2009 as the Voting Record Date with respect to all other Claims**. The applicable Voting Record Date is the date on which it will be determined: (a) which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and receive Solicitation Packages in accordance with the Disclosure Statement Order; and (b) which Holders of Claims and Equity Interests in the Non-Voting Classes are entitled to receive the Confirmation Hearing Notice, including notice of such Holder's non-voting status, in accordance with the Disclosure Statement Order.

    5.      **Contents of the Solicitation Package**

        The following documents and materials will collectively constitute the Solicitation Package:

- a cover letter from the Debtor explaining the solicitation process and urging Holders of Claims in the Voting Classes to vote to accept the Plan;

- the Confirmation Hearing Notice, attached as Exhibit 7 to the Disclosure Statement Order;

RLF1-3427156-2
NY\1558715.7

- this Disclosure Statement (and exhibits annexed thereto, including the Plan);

- the Disclosure Statement Order;

- to the extent applicable, a Ballot and/or notice, appropriate for the specific creditor, in substantially the forms attached to the Disclosure Statement Order (as may be modified for particular classes and with instruction attached thereto); and

- such other materials as the Bankruptcy Court may direct.

6.      **Distribution of the Solicitation Package to Holders of Claims Entitled to Vote on the Plan**

With the assistance of the Voting and Claims Agent, the Debtor intends to distribute Solicitation Packages on or before September 1, 2009 (the "**Solicitation Mailing Date**"). The Debtor submits that the timing of such distribution will provide such Holders of Claims with adequate time within which to review the materials required to allow such parties to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 3017(d) and 2002(b). The Debtor will make every reasonable effort to ensure that Holders who have more than one Allowed Claim in a single voting Class receive no more than one Solicitation Package. If a Holder holds Claims in more than one Class and is entitled to vote in more than one Class, such Holder will receive separate Ballots which must be used for each separate Class of Claims.

7.      **Distribution of Notices to Holders of Claims in Non-Voting Classes and Holders of Disputed Claims**

As set forth above, certain Holders of Claims and Equity Interests are **not** entitled to vote on the Plan. As a result, such parties will not receive Solicitation Packages and, instead, will receive the appropriate form of notice as follows:

- Unimpaired Claims – Deemed to Accept. Administrative Claims, DIP Facility Claims and Priority Tax Claims are unclassified, non-voting Claims and Claims in Classes 1, 2 and 3 are Unimpaired under the Plan and, therefore, are presumed to have accepted the Plan. As such, Holders of such Claims will receive, in lieu of a Solicitation Package, a "Non-Voting Status Notice With Respect to Unimpaired Classes Deemed to Accept the Plan" attached as Exhibit 4 to the Disclosure Statement Order.

- Impaired Claims – Deemed to Reject. Holders of Claims in Class 7 and Equity Interests in Class 8 are receiving no distribution under the Plan and, therefore, are conclusively presumed to reject the Plan. As such, Holders of such Claims and Equity Interests will receive, in lieu of a Solicitation Package, a "Notice of Non-Voting Status to Holders of Class 7 Junior Convertible Notes Claims and Class 8 Equity Interests That Are Deemed to Reject the Plan" attached as Exhibit 5 to the Disclosure Statement Order.

- Disputed Claims.

  (a) Any Holder of a Claim for which the Debtor has filed an objection, whether such objection related to the entire Claim or a portion thereof, will not be entitled to vote on the Plan and will not be counted in determining whether the requirements of section 1126(c) of the Bankruptcy Code have been met with respect to the Plan. Such Holders will receive a "Non-Voting Status Notice to Holders of Claims for Which an Objection has been Filed by the Debtor," attached as Exhibit 2 to the Disclosure Statement Order.

  (b) Any Holder of a Claim against the Debtor for which such Holder has timely filed a proof of claim (or an untimely proof of claim which has been allowed as timely by the Court under applicable law on or before the applicable Voting Record Date), which, in whole or in, part reflects a disputed, unliquidated, or contingent claim, and which is not subject to an objection filed by the Debtor, shall have its entire claim temporarily allowed for voting purposes only, and not for

ix

purposes of allowance or distribution, at $1.00.  Such Holders will receive (a) a Solicitation Package which contains the applicable ballot, (b) a "Confirmation Hearing Notice," which notice informs such person or entity that its entire Claim has been allowed temporarily for voting purposes only and not for purposes of allowance or distribution, at $1.00 and (c) a "Notice of Limited Voting Status to Holders of Contingent, Unliquidated or Disputed Claims for Which Not Objection Has Been Filed by the Debtor," attached as Exhibit 8 to the Disclosure Statement Order.

If any Holder described in the preceding two subparagraphs disagrees with the Debtor's classification or status of its Claim, then such Holder <u>MUST</u> file and serve a motion requesting temporary allowance of its Claim solely for voting purposes in accordance with the procedures set forth in the Disclosure Statement Order.

- <u>Contract and Lease Counterparties</u>.  Parties to certain of the Debtor's executory contracts and unexpired leases may not have scheduled Claims or Claims based upon filed Proofs of Claim pending the disposition of their contracts or leases by assumption or rejection.  To ensure that such parties nevertheless receive notice of the Plan, counterparties to the Debtor's executory contracts and unexpired leases will receive, in lieu of a Solicitation Package, a "Contract/Lease Party Notice" attached as Exhibit 6 to the Disclosure Statement Order.

### 8.  Additional Distribution of Solicitation Documents

In addition to the distribution of Solicitation Packages to Holders of Claims in Voting Classes, the Debtor will also provide parties who have filed requests for notices under Bankruptcy Rule 2002 as of the applicable Voting Record Date with the Disclosure Statement, Disclosure Statement Order and Plan.  Additionally, parties may request (and obtain at the Debtor's expense) a copy of the Disclosure Statement (and any exhibits thereto, including the Plan) by:  (a) calling the Voting and Claims Agent at (866) 381-9100; (b) writing to Dayton Superior Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (c) visiting the Debtor's restructuring website at: http://www.kccllc.net/daytonsuperior.  Parties may also obtain any documents filed in the Chapter 11 Case <u>for a fee</u> via PACER at http://www.deb.uscourts.gov.

### 9.  Filing of the Plan Supplement

The Debtor will file the Plan Supplement by September 21, 2009.  The Debtor will transmit a copy of the Plan Supplement to the Distribution List, as defined in this Section D.9.  Additionally, parties may request (and obtain at the Debtor's expense) a copy of the Plan Supplement by:  (a) calling the Dayton Superior Balloting Center at (866) 381-9100; (b) writing to Dayton Superior Balloting Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; and/or (c) visiting the Debtor's restructuring website at: http://www.kccllc.net/daytonsuperior.  Parties may also obtain any documents filed in the Chapter 11 Case <u>for a fee</u> via PACER at http://www.deb.uscourts.gov.

The Plan Supplement will include, without limitation, the following documents, to the extent not already filed as exhibits to the Plan or this Disclosure Statement:

- the Amended Organizational Documents;

- the Backstop Rights Purchase Agreement;

- the Holdings LLC Agreement;

- the Subscription Form;

- the list of Executory Contracts and Unexpired Leases designated by the Debtor to be rejected on the Effective Date;

x

- a non-exclusive list of Litigation Claims held by the Debtor as of the Effective Date;

- a list of Non-Released Parties;

- the Revolver Exit Facility Credit Agreement;

- the Revolver Exit Facility Term Sheet;

- the Term Loan Exit Facility Credit Agreement;

- the Term Loan Exit Facility Term Sheet;

- the Term Loan Exit Intercreditor Agreement;

- the Securityholder Agreement; and

- the Registration Agreement.

As used herein, the term **"Distribution List"** means (a) the Office of the United States Trustee, (b) counsel for the Committee, (c) counsel to the DIP Agent, (d) counsel to the Prepetition Term Loan Agent, (e) counsel to the Prepetition Revolving Agent, (f) the Indenture Trustees and Stock Transfer Agent (each as defined in the Disclosure Statements Order), (g) Odyssey Investment Partners, (h) Oaktree Capital Management, L.P., (i) counsel to Oaktree Capital Management, L.P., (j) Imperial Capital, LLC, (k) Conway, Del Genio, Gries & Co. LLC, (l) the Securities and Exchange Commission, (m) the Internal Revenue Service and (n) all parties that, as of the applicable date of determination, have filed requests for notice in this Chapter 11 Case pursuant to Bankruptcy Rule 2002.

## E.     VOTING PROCEDURES

Holders of Claims entitled to vote on the Plan are advised to read the Disclosure Statement Order, which set forth in greater detail the voting instructions summarized herein.

### 1.     The Voting Deadline

**The Bankruptcy Court has approved 5:00 p.m. prevailing Pacific Time on October 1, 2009 as the Voting Deadline.**  The Voting Deadline is the date by which all Ballots, Beneficial Holder Ballots and Master Ballots, as applicable, must be properly executed, completed and delivered to the Voting and Claims Agent in order to be counted as votes to accept or reject the Plan.

### 2.     Types of Ballots

The Debtor will provide the following ballots to Holders of Claims in the Voting Classes (i.e. Classes 4, 5 and 6):

- "***Ballots***", the forms of which are attached to the Disclosure Statement Order as Exhibits 3-A and 3-D, will be sent to all Holders of Class 4 Prepetition Term Loan Credit Facility Claims and all Holders of Class 6 General Unsecured Claims, respectively;

- "***Beneficial Holder Ballots***", the form of which is attached to the Disclosure Statement Order as Exhibit 3-B will be sent to Beneficial Holders of Class 5 Subordinated Note Claims; and

RLF1-3427156-2
NY\1558715.7

- *"**Master Ballots**"*, the form of which is attached to the Disclosure Statement Order as Exhibit 3-C,will be sent to Registered Record Owners and Intermediary Record Owners holding Subordinated Notes for, and voting on behalf of, Beneficial Holders of Class 5 Subordinated Note Claims.

### 3.    Voting Instructions

Under the Plan, Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan. Those Holders may so vote by completing a Ballot, Beneficial Holder Ballot and/or Master Ballot, as applicable, and returning it to the Voting and Claims Agent prior to the Voting Deadline.   There are special voting rules/procedures, however, for Beneficial Holders of Class 5 Subordinated Note Claims, which are discussed in Section I.E.4 herein (and set forth in greater detail in the Disclosure Statement Order).

> **PLEASE REFER TO THE INSTRUCTIONS ATTACHED TO THE BALLOTS, BENEFICIAL HOLDER BALLOTS OR MASTER BALLOTS THAT YOU HAVE RECEIVED FOR MORE DETAILED INFORMATION REGARDING THE VOTING REQUIREMENTS, RULES AND PROCEDURES APPLICABLE TO VOTING YOUR CLAIM.**

To be counted as votes to accept or reject the Plan, all Ballots, pre-validated Beneficial Holder Ballots and Master Ballots, as applicable, (all of which will clearly indicate the appropriate return address) must be properly executed, completed, dated and delivered by using the return envelope provided by (a) first class mail, (b) overnight courier or (c) personal delivery, so that they are **actually received** on or before the Voting Deadline by the Voting and Claims Agent at the following address:

> Dayton Superior Balloting Center
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue
> El Segundo, California  90245
>
> If you have any questions on the procedures for voting on the Plan, please call the Voting and Claims Agent at:
> (866) 381-9100

> ***\*\*\*BENEFICIAL HOLDERS OF CLASS 5 SUBORDINATED NOTE CLAIMS MUST EXECUTE, COMPLETE AND RETURN THEIR BENEFICIAL HOLDER BALLOTS IN ACCORDANCE WITH THE DISTINCT RULES FOR VOTING THEIR CLASS 5 CLAIMS SET FORTH IN SECTION I.E.4 BELOW.\*\*\****

### 4.    Voting Instructions Specific to Beneficial Holders of Class 5 Subordinated Note Claims Entitled to Vote on the Plan

Prior to the Solicitation Mailing Date, the Voting and Claims Agent will determine the identity of those Registered Record Owners and Intermediary Record Owners (collectively, "**Record Owners**") holding Subordinated Notes on behalf of Beneficial Holders as of the applicable Voting Record Date and will distribute an appropriate number of Solicitation Packages to such Record Owners to allow them to forward one to each applicable Beneficial Holder. Intermediate Record Holders will distribute Solicitation Packages to the respective Beneficial Holders within five (5) business days of receiving Solicitation Packages.

Record Owners who elect to pre-validate Beneficial Holder Ballots must deliver Solicitation Packages, including pre-validated Beneficial Holder Ballots, to Beneficial Holders along with a pre-addressed return envelope addressed to the Voting and Claims Agent.  Beneficial Holders who receive pre-validated Beneficial Holder Ballots must complete, date, execute and deliver such Beneficial Holder Ballots directly  to the Voting and Claims Agent so they are actually received on or before the Voting Deadline.

Record Owners who do not elect to pre-validate Beneficial Holder Ballots must deliver to the Beneficial Holders the Solicitation Packages, including Beneficial Holder Ballots and pre-addressed return envelops addressed to the Record Owners. Upon the return of completed Beneficial Holder Ballots, such Record Owners will summarize and compile the votes cast and/or other relevant information onto the Master Ballots and date and return the Master Ballot(s) so that they are actually received on or before the Voting Deadline by the Voting and Claims Agent.

5.    **Tabulation of Votes**

**THE FOLLOWING IS IMPORTANT INFORMATION REGARDING VOTING THAT SHOULD BE READ CAREFULLY BY ALL HOLDERS OF CLAIMS IN VOTING CLASSES.**

- FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT, PRE-VALIDATED BENEFICIAL HOLDER BALLOT OR MASTER BALLOT, AS APPLICABLE, MUST BE PROPERLY EXECUTED, COMPLETED, DATED AND DELIVERED SUCH THAT IT IS **ACTUALLY RECEIVED** ON OR BEFORE THE VOTING DEADLINE BY THE VOTING AND CLAIMS AGENT.

- A HOLDER OF A CLAIM MAY CAST ONLY ONE VOTE PER EACH CLAIM SO HELD. BY SIGNING AND RETURNING A BALLOT, BENEFICIAL HOLDER BALLOT OR MASTER BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTOR THAT NO OTHER BALLOTS, BENEFICIAL HOLDER BALLOTS OR MASTER BALLOTS WITH RESPECT TO SUCH CLAIM HAS BEEN CAST OR, IF ANY OTHER BALLOTS, BENEFICIAL HOLDER BALLOTS OR MASTER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLAIM, SUCH EARLIER BALLOTS, BENEFICIAL HOLDER BALLOTS OR MASTER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.

- **ANY BALLOT, BENEFICIAL HOLDER BALLOT OR MASTER BALLOT THAT IS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED TOWARD CONFIRMATION OF THE PLAN UNLESS THE DEBTOR HAS GRANTED AN EXTENSION OF THE VOTING DEADLINE IN WRITING WITH RESPECT TO SUCH BALLOT, BENEFICIAL HOLDER BALLOT OR MASTER BALLOT.**

- **ADDITIONALLY, THE FOLLOWING BALLOTS, BENEFICIAL HOLDER BALLOTS AND MASTER BALLOTS WILL NOT BE COUNTED:**

    o    any Ballot, Beneficial Holder Ballot or Master Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

    o    any Ballot, Beneficial Holder Ballot or Master Ballot cast by an entity that does not hold a Claim in a Class that is entitled to vote on the Plan;

    o    any Ballot, Beneficial Holder Ballot or Master Ballot cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no Proof of Claim was timely filed;

    o    any Ballot, Beneficial Holder Ballot or Master Ballot that (a) is properly completed, executed and timely filed, but does not indicate an acceptance or rejection of the Plan, or (b) indicates both an acceptance and rejection of the Plan, or (c) partially accepts and partially rejects the Plan

RLF1-3427156-2
NY\1558715.7

o    any Ballot, Beneficial Holder Ballot or Master Ballot cast for a Claim that is subject to an objection pending as of the applicable Voting Record Date (except as otherwise provided in the Disclosure Statement Order);

o    any Ballot, Beneficial Holder Ballot or Master Ballot sent to the Debtor, the Debtor's agents/representatives (other than the Voting and Claims Agent), the Indenture Trustees or the Debtor's financial or legal advisors;

o    any Ballot, Beneficial Holder Ballot or Master Ballot transmitted by facsimile, telecopy or electronic mail;

o    any unsigned Ballot, Beneficial Holder Ballot or Master Ballot; or

o    any Ballot, Beneficial Holder Ballot or Master Ballot not cast in accordance with the procedures approved in the Disclosure Statement Order.

## F.    CONFIRMATION OF THE PLAN

### 1.    The Confirmation Hearing

**The Confirmation Hearing will commence at 1:30 p.m. prevailing Eastern Time on October 14, 2009** before the Honorable Brendan Shannon, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom 1, Wilmington, Delaware 19801-3024. The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtor without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order. Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

### 2.    The Deadline for Objecting to Confirmation of the Plan

**The Confirmation Objection Deadline is 4:00 p.m. prevailing Eastern Time on October 1, 2009**. Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim of such Entity; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties set forth below (the "**Notice Parties**"). CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

*Notice Parties*

(a)  Counsel to the Debtor, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022-4834 (Attn: Joseph S. Fabiani) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Lee E. Kaufman);

(b)  Counsel to the Committee, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038 (Attn: Kenneth Pasquale and Erez Gilad) and Morris, Nichols, Arsht & Tunnel, 1201 N. Market Street, P.O. Box 1347, Wilmington, Delaware 19801 (Attn: Robert J. Dehney);

(c)  Counsel to the Ad Hoc Noteholders Committee, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022-4611 (Attn: Christopher Marcus) and Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705 (Attn: Laura Davis Jones);

RLF1-3427156-2
NY\1558715.7

(d) <u>Counsel to the DIP Agent</u>, King & Spalding LLP, 1180 Peachtree Street N.E. Atlanta, Georgia 30309 (Attn: Sarah Robinson Borders) and Morris James LLP, 500 Delaware Avenue, Suite 1500, P.O. Box 2306 Wilmington, Delaware 19899-2306 (Attn: Stephen M. Miller);

(e) <u>The Office of the United States Trustee for the District of Delaware</u>, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Mark Kenney).

**3.      Effect of Confirmation of the Plan**

Article X of the Plan contains certain provisions relating to (a) the compromise and settlement of Claims, (b) the release of the Released Parties by the Debtor and the Holders of Claims and Equity Interests, and each of their respective Related Persons, and (c) exculpation of certain parties. **It is important to read such provisions carefully so that you understand the implications of these provisions with respect to your Claim such that you may cast your vote accordingly.**

> THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

**G.      CONSUMMATION OF THE PLAN**

It will be a condition to confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan. Following confirmation, the Plan will be consummated on the Effective Date.

**H.      RISK FACTORS**

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN SECTION VI HEREIN TITLED, "PLAN-RELATED RISK FACTORS."**

## II.
## BACKGROUND TO THE CHAPTER 11 CASE

**A.     THE DEBTOR'S CORPORATE HISTORY AND STRUCTURE**

The Debtor was incorporated in 1959 as the successor to a business that was founded in 1924. Beginning in the early 1990's, the Debtor made a number of strategic acquisitions to broaden its product offering and expand its markets. From 1994 to 2001, the Debtor acquired 16 companies, which collectively more than doubled the Debtor's revenues. These acquisitions expanded the Debtor's geographic reach, broadened its product offerings and solidified its leadership position in many of the markets it served. Many of these acquired businesses operated as autonomous business units under the Debtor's ownership. Under this structure, the Debtor acted as a holding company with six separate business units, each supported by its own administrative infrastructure and personnel.

In June 2000, Odyssey Investment Partners acquired a controlling interest in the Debtor. Commencing in 2001, in response to a softening in the commercial sector of the non-residential construction market, the Debtor undertook a strategy to consolidate operating divisions to reduce redundant overhead expenses and centralize procurement of goods and services. In addition to approximately 950 headcount reductions, during the period from 2001 to 2005, the Debtor consolidated manufacturing and distribution facilities, closing 31 facilities. The Debtor undertook this strategy to keep its cost structure in alignment with its net sales. In December 2006, the Debtor commenced an initial public offering of its common stock. In connection with its initial public offering, the Debtor consummated a reincorporation merger that transferred its state of incorporation from Ohio to Delaware.

The Debtor has a single subsidiary, Dayton Superior Canada, Ltd., which operates as a distributor and manufacturer of the Company's products in Canada and is not the subject of an insolvency proceeding under the laws of any country.

**B.     OVERVIEW OF THE DEBTOR'S BUSINESS**

**1.     The Debtor's Manufacturing Operations**

The Debtor is a leading provider of specialized products consumed in non-residential, concrete construction in North American and is among the largest concrete forming and shoring rental company serving the domestic, non-residential construction market. The Debtor's products can be found on construction sites nationwide and are used in non-residential construction projects, including:

- infrastructure projects, such as highways, bridges, airports, power plants and water management projects;
- institutional projects, such as schools, stadiums, hospitals and government buildings; and
- commercial projects, such as retail stores, offices and recreational, distribution and manufacturing facilities.

Although certain of the Debtor's products can be used in residential construction projects, less than 5% of its revenues are attributable to residential construction activity.

The Debtor sells most of its 17,000 products under well-established brand names. Its products are used to help form, strengthen, move, stabilize, cure, or color concrete. Its products are generally imbedded in, or applied to, concrete and consumed during the construction process, thereby providing the Debtor with a source of recurring revenue. The Debtor's products include metal and plastic bar supports, anchor bolts, snap ties, wall forming products, rebar splicing devices, load transfer units, precast and tilt-up construction lifting hardware, and construction chemicals. In addition, the Debtor sells a complete line of new and used forming and shoring systems, which may be combined to create solutions for a wide variety of customer-specific applications. The Debtor also rents a complete line of forming and shoring systems, and its rental fleet is one of the largest and most diverse in North America.

The Debtor manufactures and sources its products through a balanced combination of North American manufacturing facilities and strategic outsourcing relationships. The Debtor uses its network of 45 distribution,

1

manufacturing, and sales and service centers to establish a strong local presence in each of the markets it serves, which allows the Debtor to deliver its broad product offering, technical expertise, and customer service in a timely and efficient manner to its customers. The Debtor serves approximately 3,800 customers, consisting primarily of regional dealers and a broad array of general contractors and sub-contractors. The Debtor's distribution, manufacturing, and service network is among the largest in the Debtor's industry.

In 2008, the Debtor generated $476 million in net sales, 84% of which were from product sales. Approximately 84% of the 2008 product sales (or approximately 72% of the Debtor's total net sales) were generated through the sale of consumable products. This mix of consumable versus reusable products, which is typical for the Debtor's business, represents a significant source of recurring revenue for the Debtor.

**C.      PREPETITION INDEBTEDNESS**

**1.      The Prepetition Credit Agreements**

During the first quarter of 2008, the Debtor refinanced a portion of its long-term debt and entered into a $150 million revolving credit facility (the "**Prepetition Revolving Credit Facility**") and the $100 million term loan credit facility (the "**Prepetition Term Loan Credit Facility**" and together with the Prepetition Revolving Credit Facility, the "**Prepetition Credit Facilities**"). The proceeds of the Prepetition Term Loan Credit Facility and an initial draw on the Prepetition Revolving Credit Facility were used to repay the Debtor's then-outstanding $165 million senior second secured notes. The Prepetition Revolving Credit Facility and Prepetition Term Loan Credit Facility are governed, respectively, by the terms and conditions of the Prepetition Revolving Credit Agreement and Prepetition Term Loan Credit Agreement (together, the "**Prepetition Credit Agreements**"). The Prepetition Credit Facilities were originally scheduled to mature on March 14, 2009 but, pursuant to various amendments, the respective maturity dates were extended to April 20, 2009.

Prepetition Revolving Credit Agreement.   As of the Petition Date, there was approximately $109,770,019.80 outstanding on the Prepetition Revolving Credit Facility, inclusive of approximately $8,924,107.50 in outstanding letter of credit obligations issued under the Prepetition Revolving Credit Facility.  The Prepetition Revolving Credit Facility was secured by security interests in and liens on (the "**Prepetition Revolving Loan Liens**") substantially all the assets of the Debtor, with priorities established by the Prepetition Intercreditor Agreement.

Prepetition Term Loan Credit Agreement.  As of the Petition Date, there was approximately $103,152,385 outstanding under the Prepetition Term Loan Credit Facility.  The Prepetition Term Loan Credit Facility was secured by security interests in and liens on (the "**Prepetition Term Loan Liens**" and together with the Prepetition Revolving Loan Liens, the "**Prepetition Liens**") substantially all the assets of the Debtor, with priorities established by the Prepetition Intercreditor Agreement.

Prepetition Intercreditor Agreement.  Pursuant to the Prepetition Intercreditor Agreement, the Prepetition Liens have different priorities on the Debtor's assets and properties (all of the property and assets of the Debtor, the "**Prepetition Collateral**").  Specifically, the Prepetition Revolving Loan Liens were first priority security interests in and liens on the working capital assets of the Debtor (the "**Prepetition Revolving Credit Priority Collateral**"), such as accounts, inventory, instruments and chattel paper, and were second priority security interests in and liens on the other portions of the Prepetition Collateral.  The Prepetition Term Loan Liens were first priority liens on all Prepetition Collateral other than the Prepetition Revolving Credit Priority Collateral, and were second priority liens on the Prepetition Revolving Credit Priority Collateral.

**2.      The Subordinated Notes**

On June 16, 2000, the Debtor issued $170 million of the Subordinated Notes.  The Subordinated Notes are unsecured obligations of the Debtor and were subordinated in right of payment to the Prepetition Credit Facilities.  The Subordinated Notes had a maturity date of June 15, 2009.  As of the Petition Date, approximately $161,636,231 in aggregate principal amount and accrued interest of the Subordinated Notes was outstanding.

2

D.    **EVENTS LEADING TO THE CHAPTER 11 FILING**

    1.    **The Debtor was Overleveraged and Was Unable to Reduce its Debt Level**

As described above, the Debtor had a substantial amount of debt as of the Petition Date. This debt level, in turn, resulted in interest expense of over $50 million for the year ending December 31, 2008. Servicing this debt level adversely affected the financial health of the Debtor by forcing the Debtor to allocate a substantial portion of its cash flow to making interest payments on its long term debt. Moreover, the Prepetition Credit Facilities and the Subordinated Notes, representing approximately $374,558,636 of the Debtor's long term debt as of the Petition Date, were scheduled to mature between March and June of 2009.

In 2008, the Debtor made a concerted effort to reduce its debt level. In July 2008, the Debtor commenced a private offer to exchange the Subordinated Notes in a private placement for an equal amount of newly issued senior secured notes due September 2014. The Debtor periodically extended the offer. However, the Debtor was not successful in obtaining acceptance by the holders of the required 95% in aggregate principal amount of the Subordinated Notes. In late 2008, the Debtor explored alternative ways to relieve its financial distress, including a refinancing of the Prepetition Credit Facilities or a sale of the Debtor. To accomplish this, the Debtor began negotiations with the Prepetition Revolving Lenders, the Prepetition Term Loan Lenders and the Ad Hoc Noteholders Committee. Negotiations continued with the various parties through the end of 2008 and into the beginning of 2009. However, due to the general unavailability of credit in the global financial markets, the Debtor was unable to refinance the Prepetition Credit Facilities.

    2.    **The Debtor Faced Tighter Credit, Rising Expenditures and an Industry Downturn in Early 2009**

Due to the Debtor's financial condition in early 2009, many of the Debtor's vendors refused to continue to extend it credit, or reduced the terms on which they extended credit, requiring the Debtor to accelerate the payment of cash to its vendors. The Debtor also faced significantly higher expenditures in that period due to payments to its financial and legal advisors, as well as fees and other amounts payable to its lenders and their advisors in connection with the aforementioned amendments to the Prepetition Credit Agreements. Though the amendments delayed the maturity of the Prepetition Credit Facilities, they also restricted the Debtor's use of operating cash flow. Furthermore, the Debtor's cash flow was negatively affected by the downturn in the nonresidential construction industry in which it primarily operates.

    3.    **The Impending Maturity of the Debtor's Prepetition Credit Facilities**

As stated above, the Prepetition Credit Facilities were originally scheduled to mature on March 14, 2009. Despite several extensions to the maturity date of the Prepetition Credit Facilities, the Debtor's inability to (i) refinance the Prepetition Credit Facilities; (ii) reach an alternative out-of-court agreement to restructure its debt; and (iii) further extend the maturity date of the Prepetition Credit Facilities, resulted in the filing of the Chapter 11 Case on the Petition Date.

RLF1-3427156-2
NY\1558715.7

**III.**
**EVENTS DURING THE CHAPTER 11 CASE**

**A.    FIRST DAY MOTIONS AND CERTAIN RELATED RELIEF**

Immediately following the Petition Date, the Debtor devoted substantial efforts to stabilizing its operations and preserving and restoring its relationships with, among others, vendors, customers, employees and utility providers that the Debtor believed could be impacted by the commencement of the Chapter 11 Case. As a result of these initial efforts, the Debtor was able to minimize, as much as practicable, the negative impacts of the commencement of the Chapter 11 Case.

On or around the Petition Date, in addition to filing its voluntary petition for relief, the Debtor also filed a number of motions (collectively referred to herein as "**First Day Motions**") with the Bankruptcy Court. At hearings conducted on April 20, 2009, April 21, 2009 and May 20, 2009, the Bankruptcy Court entered several orders to, among other things:  (i) prevent interruptions to the Debtor's business; (ii) ease the strain on the Debtor's relationships with certain essential constituents, including employees, vendors, customers and utility providers; (iii) provide access to critical working capital; and (iv) allow the Debtor to retain certain advisors to assist it with the administration of the Chapter 11 Case (each, a "**First Day Order**").

**1.    Procedural Motions**

To facilitate a smooth and efficient administration of the Chapter 11 Case, the Bankruptcy Court entered certain "procedural" First Day Orders, by which the Bankruptcy Court (a) approved an extension of time to file the Debtor's Schedules (which were filed on June 15, 2009), (b) established notice and hearing procedures with respect to trading in equity securities of the Debtor and (c) extending the Debtor's deadline to file statements pursuant to Bankruptcy Rule 2015.3 and approving reporting procedures related thereto.

**2.    Employment of Advisors**

To assist the Debtor in carrying out its duties as debtor in possession and to represent its interests in the Chapter 11 Case, the Bankruptcy Court entered First Day Orders authorizing the Debtor to retain and employ the following advisors:  (a) Latham & Watkins LLP and Richards, Layton & Finger, P.A., as restructuring counsel; (b) Moelis & Company, LLC, as financial advisor; (c) Edward Howard as communications consultant; and (d) Kurtzman Carson Consultants LLC as the Voting and Claims Agent in the Chapter 11 Case. The Debtor also sought and obtained orders approving and establishing procedures for the retention of professionals utilized in the ordinary course of the Debtor's business.  Additionally, in June 2009, the Bankruptcy Court entered orders approving the retention of certain other advisors, such as  (a) Thompson Hine LLP, as special counsel; (b) Ernst & Young LLP, as bankruptcy tax advisors; and (c) AlixPartners, LLP as restructuring advisor.

**3.    Stabilizing Operations**

Recognizing that any interruption of the Debtor's business, even for a brief period of time, would negatively impact its operations, customer relationships, revenue and profits, the Debtor filed a number of First Day Motions to help facilitate a stabilization of its manufacturing operations and effectuate, as much as possible, a smooth transition into operations as debtor in possession. Specifically, in addition to certain orders discussed in greater detail below, the Debtor sought and obtained First Day Orders authorizing the Debtor to:

- maintain and administer customer programs and honor its obligations arising under or relating to those customer programs;

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical and similar benefits;

4

- pay prepetition obligations to common carriers and contractors able to perfect mechanics', artists', materialsmens' or other liens in respect of prepetition obligations;

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance;

- continue insurance coverage, including performance under its self-insurance programs, and enter into new insurance policies, if necessary;

- maintain its existing cash management system; and

- remit and pay certain taxes and fees.

In addition to the foregoing relief, to prevent the imposition of the automatic stay from disrupting its business and to ensure continued deliveries on favorable credit terms, the Debtor sought and obtained Bankruptcy Court approval to pay the prepetition claims of certain vendors and third-party service providers who the Debtor believed were essential to the ongoing operation of its business. Indeed, the Debtor's ability to pay the claims of these vendors and service providers was critical to maintaining ongoing business operations due to the Debtor's inability to acquire essential replacement goods and services of the same quality, reliability, cost or availability from other sources and, ultimately, to the success of the Debtor's Chapter 11 Case.

Similarly, to reduce the potentially negative effects of its bankruptcy on operations, the Debtor sought and obtained Bankruptcy Court approval to pay prepetition claims of vendors entitled to administrative expense status under Section 503(b)(9) of the Bankruptcy Code. Satisfying these obligations early in its Chapter 11 Case, rather than upon the Effective Date, enabled the Debtor to effectuate a smoother transition into chapter 11, and helped alleviated some of the strain that a chapter 11 filing can place on a debtor's relationships with its vendors.

### 4.    DIP Financing and Use of Cash Collateral

A critical goal of the Debtor's business stabilization efforts was to ensure the Debtor maintained sufficient liquidity to operate its business during the pendency of the Chapter 11 Case. As such, beginning in March, 2009, the Debtor and its advisors began considering alternative methods of relieving the Debtor's financial distress and preparing for the contingency of a chapter 11 filing by negotiating the terms of potential debtor-in-possession financing facilities with the Prepetition Revolving Lenders and the Ad Hoc Noteholders Committee. Two alternative DIP financing proposals emerged from these negotiations: a debtor-in-possession financing proposal from GE Capital and an alternative proposal from the Ad Hoc Noteholders Committee. After carefully evaluating the terms and costs of the competing financing proposals, the Debtor's senior management and advisors determined that, on balance, GE Capital's proposal presented superior debtor-in-possession financing. The financing proposed by GE Capital provided the Debtor much-needed liquidity with greater certainty and without the risk of protracted, costly litigation which would have resulted from the Debtor's acceptance of the Ad Hoc Noteholders Committee's proposal.

Therefore, on the Petition Date, the Debtor filed its Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code (I) Authorizing the Debtor to (A) Obtain Post-Petition Financing, (B) Use Cash Collateral and (C) Repay the Prepetition Revolving Obligations, (II) Granting Adequate Protection to Prepetition Secured Lenders, (III) Granting Security Interests and Superpriority Administrative Expense Status to the DIP Lenders, (IV) Scheduling a Final Hearing and (V) Granting Related Relief [Docket No. 17] (the "**DIP Motion**"). In the DIP Motion, the Debtor sought permission from the Court to enter into the DIP Facility, pursuant to which the Debtor obtained a $165 million revolving credit facility. The Debtor's obligations under the DIP Facility would be granted super-priority administrative claim status, and would be secured by (i) a first priority priming lien on the Revolver Credit Priority Collateral and (ii) a second priority lien on substantially all of the Debtor's remaining property and assets. The DIP Facility also provided for the satisfaction of the Prepetition Revolving Credit Facility (the "**Roll-Up**").

The Ad Hoc Noteholders Committee objected to the DIP Motion arguing, among other things, that the Roll-Up was improper and that the Court should not approve the DIP Facility because the Ad Hoc Noteholders Committee's proposal was a better financing alternative.

At the hearing held on April 21, 2009, the Bankruptcy Court entered the Interim DIP Order, which, among other things: (a) authorized the Debtor to borrow up to $165 million under the DIP Facility ($145 million of which was made available upon entry of the Interim DIP Order); (b) authorized the Roll-Up, but expressly reserved all parties' rights to object to the Roll-Up (and have such Roll-Up unwound) at the final hearing on the DIP Motion; and (c) approved the Debtor's request to use cash collateral.

Thereafter, the Debtor, the DIP Lenders, the Ad Hoc Noteholders Committee and their respective professionals continued to negotiate the terms of the DIP Facility.  As a result of those negotiations, the Debtor and the DIP Lenders entered into that certain Amendment #1 to Senior Secured Priming and Superpriority Debtor-in-Possession Revolving Credit Agreement, dated as of June 5, 2009 (the "**DIP Amendment**"), which improved the economic terms of the DIP Facility by lowering the interest rate and facility fees and extended certain chapter 11 milestones.  The Ad Hoc Noteholders Committee agreed to withdraw its objection to the DIP Motion upon the Court's approval of these modifications to the DIP Facility.  On June 5, 2009, the Court entered the Final DIP Order approving the Debtor's entry into the DIP Facility, as amended by the DIP Amendment.

The financing provided under the DIP Facility and the use of cash collateral has allowed the Debtor to, among other things:  (a) continue its business in an orderly manner; (b) maintain its valuable relationships with vendors, suppliers, customers and employees; (c) pay various interest, fees and expenses under the DIP Facility; and (d) support its working capital, general corporate and overall operational needs - all of which were necessary to preserve and maintain the going-concern value of the Debtor's business and, ultimately, help ensure a successful reorganization.

## B.      THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

### 1.      Appointment of the Committee

On April 30, 2009, the U.S. Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  The members of the Committee included the following:  (a) OCM Principal Opportunities Fund IV, L.P.; (b) Whippoorwill Distressed Opportunity Fund, L.P.; (c) The Bank of New York Mellon, as Indenture Trustee; (d) U.S. Bank National Association, as indenture trustee for the Junior Convertible Notes; (e) Ulma Form Works, Inc.; (e) Alsina Forms Co., Inc.; and (f) Keystone Steel & Wire Co.  On or around May 19, 2009, Keystone Steel & Wire Co. resigned as a Committee member.

The Committee retained (a) Stroock & Stroock & Lavan LLP, as lead counsel; (b) Morris, Nichols, Arsht & Tunnell LLP, as Delaware counsel; (c) Conway, Del Genio, Gries & Co., LLC, as financial advisor; and (d) Epiq Bankruptcy Solutions, LLC, as its website administrative agent.

### 2.      Meeting of Creditors

The meeting of creditors pursuant to section 341 of the Bankruptcy Code was held on June 19, 2009 at the J. Caleb Boggs Federal Building in Wilmington, Delaware.  In accordance with Bankruptcy Rule 9001(5), one representative of the Debtor, as well as counsel to the Debtor, attended the meeting and answered questions posed by the U.S. Trustee and other parties in interest present at the meeting.

## C.      FILING OF THE SCHEDULES AND ESTABLISHMENT OF THE CLAIMS BAR DATE

### 1.      Filing of the Schedules

On June 15, 2009, the Debtor filed its Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code.

2.      **Establishment of the Claims Bar Date**

On July 14, 2009, the Bankruptcy Court entered that certain Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Administrative Expense Claims Under Section 503(b)(9) of the Bankruptcy Code) and Approving the Form and Manner of Notice Thereof, (Docket No. 349, the "**Bar Date Order**"), establishing August 25, 2009 as the Claims Bar Date and establishing October 19, 2009 as the Governmental Bar Date.

D.      **REORGANIZATION STRATEGY**

1.      **Enhancing the Debtor's Business Operations**

With the assistance of its advisors, the Debtor has been focused on developing and executing a reorganization strategy to (a) maximize the value of its Estate, (b) address the factors that led to the bankruptcy filing and (c) enable the Debtor to emerge from chapter 11 a stronger, more viable company. Specifically, this reorganization strategy is primarily (though not exclusively) focused on:

- restructuring the Debtor's balance sheet and emerging from chapter 11 with as long-term capital structure conducive to future profitability;

- managing the Debtor's business to enhance its financial and operating performance, including utilizing the unique powers and opportunities afforded to a chapter 11 debtor in possession; and

- reviewing the Debtor's Executory Contracts and Unexpired Leases to determine whether there are benefits to the Debtor in assuming or rejecting any Executory Contracts or Unexpired Leases.

2.      **Appropriate Capital Structure, Conversion of Debt and Rights Offering**

As set forth above, as of the Petition Date, the Debtor had outstanding debt of approximately $413 million. Upon emergence from chapter 11, the Reorganized Debtor will have an improved balance sheet and more appropriate capital structure resulting from (i) the conversion of approximately $161 million of Subordinated Notes into New Stock and (ii) the $100.0 million Rights Offering. The Reorganized Debtor will be party to the $110 million Revolver Exit Facility and will have an approximate balance of $100 million under the Term Loan Exit Facility (collectively, the "**Exit Facilities**").

E.      **EXCLUSIVE PERIOD FOR FILING A PLAN AND SOLICITING VOTES**

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief. If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the Petition Date to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a competing plan of reorganization; however, a court may extend these periods upon request of a party in interest and "for cause."

The Debtor's initial exclusive periods to file a plan and solicit acceptances of a plan are set to expire on August 17, 2009 and October 15, 2009, respectively. The Debtor filed a motion with the Bankruptcy Court on August 12, 2009 seeking to extend these deadlines to November 16, 2009 and January 13, 2010, respectively.

F.      **DEADLINE TO ASSUME OR REJECT LEASES OF NONRESIDENTIAL REAL PROPERTY**

Pursuant to section 365(d)(4) of the Bankruptcy Code, the time within which the Debtor has to assume or reject unexpired leases of nonresidential real property is also scheduled to expire on August 17, 2009, unless extended by order of the Bankruptcy Court. To that end, on July 31, 2009, the Debtor filed a motion with the Bankruptcy Court requesting authority to extend this deadline through the earlier to occur of (i) the Effective Date of the Plan and (ii) November 16, 2009.

G.    **SUMMARY OF EXIT FACILITIES**

It is a condition precedent to the Consummation of the Plan that the Reorganized Debtor enter into the Revolver Exit Facility Credit Agreement and the Term Loan Exit Facility Credit Agreement (collectively the "**Exit Facility Credit Agreements**"). It is possible, however, that such terms may be modified on or prior to the Effective Date and that the terms of the Exit Facility Credit Agreements may ultimately be materially different than those described herein.

Revolver Exit Facility. The Revolver Exit Facility will consist of a revolving credit facility of up to $110,000,000, with a $20,000,000 letter of credit sub-facility and a $10,000,000 swing line loan sub-facility. The Revolver Exit Facility will mature four years from the Effective Date. The availability of the Reorganized Debtor's borrowings under the Revolver Exit Facility will be limited as set forth in the "Availability" section of the Revolver Exit Term Sheet. Borrowings under the Revolver Exit Facility that do not constitute borrowings of the Permitted Overadvance Amount (as defined in the Revolver Exit Term Sheet) will bear interest at an annual rate of the Eurodollar Rate (as defined in the Revolver Exit Term Sheet) plus 5.5% per annum, with a Eurodollar Rate floor of 3.0%. The Reorganized Debtor's obligations under the Revolver Exit Facility will be secured by security interests in and liens on substantially all assets of the Reorganized Debtor, with priorities established by the Term Loan Exit Intercreditor Agreement.

Term Loan Exit Facility. The principal amount of the Term Loan Exit Facility will be approximately (i) $103,152,385, plus reasonable fees and expenses and postpetition interest (calculated at the applicable rate provided for in the Term Loan Exit Facility Term Sheet) accrued under the Prepetition Term Loan Credit Agreement as of the Effective Date minus (ii) the sum of (a) the Prepetition Term Loan Payment Amount plus (b) any fees and expenses payable under the Prepetition Term Loan Credit Agreement that are paid as Transaction Expenses. The terms of the Term Loan Exit Facility are summarized in the Term Loan Exit Facility Term Sheet. The Reorganized Debtor's obligations under the Term Loan Exit Facility will be secured by security interests in and liens on substantially all assets of the Reorganized Debtor, and guaranteed by Intermediate Holdings (as defined below) and each of Intermediate Holdings' existing and subsequently acquired or formed direct and indirect subsidiaries (other than certain excluded foreign subsidiaries) with such guarantees secured by all assets of the guarantors, including a pledge of all equity interests owned by such guarantors, with priorities established by the Term Loan Exit Intercreditor Agreement.

Term Loan Exit Intercreditor Agreement. The terms of the Term Loan Exit Intercreditor Agreement will be substantially the same as the terms of the Prepetition Intercreditor Agreement, with modifications approved by the Court.

8

# IV.
## SUMMARY OF THE PLAN

> **THIS SECTION IV IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS SECTION IV AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.**

## A.   ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS

### 1.   Administrative Claims

Subject to sub-paragraph (a) below, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash for the unpaid portion of such Allowed Administrative Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or Reorganized Debtor, as applicable, and such Holder; provided, however, that Administrative Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtor or Reorganized Debtor without further notice to or order of the Bankruptcy Court.

### (a)   Bar Date for Administrative Claims

Except as otherwise provided in Article II.A of the Plan, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date will be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtor or the Reorganized Debtor or its Estate and property and such Administrative Claims will be deemed discharged as of the Effective Date. All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X.F of the Plan. Objections to such requests must be Filed and served on the Reorganized Debtor and the requesting party by the later of (i) 120 days after the Effective Date and (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by order of the Bankruptcy Court.

### (b)   Professional Compensation and Reimbursement Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtor and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Fees Bar Date; provided that the Reorganized Debtor will pay Professionals in the ordinary course of business for any work performed after the Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtor and the requesting party by the later of (a) 90 days after the Effective Date and (b) 30 days after the Filing of the

9

applicable request for payment of the Professional Fee Claim. Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized Debtor in Cash within five Business Days of entry of the order approving such Allowed Professional Fee Claim. Notwithstanding the foregoing, the Debtor shall, on the Effective Date and as part of the Transaction Expenses, pay the Ad Hoc Noteholders Committee Fees and Expenses and all unpaid reasonable fees and expenses (whether accrued prepetition or postpetition) of the Prepetition Term Loan Agent and Prepetition Term Loan Lenders, including all accrued and unpaid reasonable fees and expenses (whether accrued prepetition or postpetition) of Gibson, Dunn & Crutcher, LLP, Broadpoint Capital, Inc. and Young Conaway Stargatt & Taylor, LLP payable pursuant to the Term Loan Exit Facility Term Sheet as Administrative Claims in the ordinary course of the business, without application by or on behalf of any such parties to the Bankruptcy Court, and without notice and a hearing; provided however that, if the Debtor or Reorganized Debtor and any such Entity cannot agree on the amount of fees and expenses to be paid to such party, the reasonableness of any such fees and expenses will be determined by the Bankruptcy Court.

## 2.    DIP Facility Claims

Unless otherwise agreed to by the DIP Lenders, the Allowed DIP Facility Claims will be indefeasibly paid in full in Cash on the Effective Date in full satisfaction, settlement, discharge and release of, and in exchange for, such DIP Facility Claims. Upon indefeasible payment and satisfaction in full of all Allowed DIP Facility Claims, the DIP Facility Credit Agreement and Prepetition Revolving Credit Agreement, and all "Loan Documents" as defined therein, respectively, and all Liens and security interests granted to secure the DIP Facility Claims and/or Prepetition Revolving Credit Agreement Claims, will be immediately terminated, extinguished and released and/or assigned to the Reorganized Debtor's lenders under the Revolver Exit Facility, as applicable, and the respective Administrative and Collateral Agents will promptly execute and deliver to the Reorganized Debtor such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtor. Notwithstanding the above, any indemnity provisions contained in the DIP Facility Credit Agreement shall survive such termination, release and satisfaction in the manner and to the extent set forth therein.

## 3.    Priority Tax Claims

The legal, equitable and contractual rights of the Holders of Priority Tax Claims are unaltered by the Plan. Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor or Reorganized Debtor:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) such other less favorable treatment as agreed to in writing by the Debtor or Reorganized Debtor, as applicable, and such Holder; provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (c) pursuant to and in accordance with sections 1129(a)(9)(C) and (D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five years after the Petition Date, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtor or Reorganized Debtor, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, further, that Priority Tax Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtor or Reorganized Debtor without further notice to or order of the Bankruptcy Court. Any installment payments to be made under clause (c) above will be made in equal quarterly Cash payments beginning on the Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

## B.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

### 1.    Summary

All Claims and Equity Interests, except Administrative Claims, DIP Facility Claims and Priority Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code,

10

Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified, as described in Article II of the Plan.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

2.    **Classification and Treatment of Claims and Equity Interests**

(a)    Class 1 – Other Priority Claims

o    *Classification*: Class 1 consists of the Other Priority Claims against the Debtor.

o    *Treatment*: The legal, equitable and contractual rights of the Holders of Class 1 Claims are unaltered by the Plan. Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim on the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor or Reorganized Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor or Reorganized Debtor and the Holder of such Allowed Class 1 Claim shall have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; <u>provided</u>, however, that Class 1 Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto in the discretion of the Debtor or Reorganized Debtor without further notice to or order of the Bankruptcy Court.

o    *Voting*: Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan.

(b)    Class 2 – Other Secured Claims

o    *Classification*: Class 2 consists of the Other Secured Claims against the Debtor.

o    *Treatment*: The legal, equitable and contractual rights of the Holders of Class 2 Claims are unaltered by the Plan. Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim on the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtor or Reorganized Debtor: (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtor or Reorganized Debtor and the Holder of such Allowed Class 2 Claim shall have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant

11

to section 1124 of the Bankruptcy Code; provided, however, that Class 2 Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto in the discretion of the Debtor or Reorganized Debtor without further notice to or order of the Bankruptcy Court. Each Holder of an Allowed Other Secured Claim will retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided herein. On the full payment or other satisfaction of such obligations, the Liens securing such Allowed Other Secured Claim will be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

o   *Voting*: Class 2 is an Unimpaired Class, and the Holders of Class 2 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims will not be entitled to vote to accept or reject the Plan.

(c)   Class 3 - Secured Tax Claims

o   *Classification*: Class 3 consists of the Secured Tax Claims against the Debtor.

o   *Treatment*: The legal, equitable and contractual rights of the Holders of Class 3 Claims are unaltered by the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim due and payable on or prior to the Effective Date will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the Debtor or Reorganized Debtor: (a) Cash in an amount equal to the amount of such Allowed Class 3 Claim; (b) such other less favorable treatment as agreed to in writing by the Debtor or Reorganized Debtor, as applicable, and such Holder; provided, however, that such parties may further agree for the payment of such Allowed Class 3 Claim at a later date; or (c) pursuant to and in accordance with sections 1129(a)(9)(C) and (D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five years after the Petition Date, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtor or Reorganized Debtor, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, further, that Class 3 Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtor or Reorganized Debtor without further notice to or order of the Bankruptcy Court. Each Holder of an Allowed Class 3 Claim will retain the Liens securing its Allowed Class 3 Claim as of the Effective Date until full and final payment of such Allowed Class 3 Claim is made as provided herein. On the full payment or other satisfaction of such obligations, the Liens securing such Allowed Class 3 Claim will be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any installment payments to be made under clause (c) above will be made in equal quarterly Cash payments beginning on the first Subsequent Distribution Date following the Effective Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Secured Tax Claim.

12

- o *Voting*: Class 3 is an Unimpaired Class, and the Holders of Class 3 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 3 Claims will not be entitled to vote to accept or reject the Plan.

(d)  Class 4 – Prepetition Term Loan Credit Facility Claims

- o *Classification*: Class 4 consists of Prepetition Term Loan Credit Facility Claims against the Debtor.

- o *Allowance*: On the Effective Date, Prepetition Term Loan Credit Facility Claims will be deemed Allowed in an aggregate amount equal to $103,152,385, plus reasonable fees and expenses and accrued postpetition interest (payable at the rate provided for in the Term Loan Exit Facility Term Sheet).

- o *Treatment*: On the Effective Date, the Prepetition Term Loan Credit Agreement and all "Loan Documents" as defined therein will be replaced in their entirety by the Term Loan Exit Facility Credit Agreement and all "Loan Documents" as defined therein. On the Effective Date, the Distribution Agent will receive for and on behalf of each and every Holder of an Allowed Prepetition Term Loan Credit Facility Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, (i) the Prepetition Term Loan Payment Amount and (ii) the notes issued in connection with the Term Loan Exit Facility, which the Distribution Agent will promptly distribute Pro Rata to or for the benefit of Holders of Allowed Prepetition Term Loan Credit Facility Claims. Upon the Distribution Agent's receipt of the foregoing, the Prepetition Term Loan Credit Agreement and all "Loan Documents" as defined therein, and all Liens securing such Allowed Prepetition Term Loan Credit Facility Claims, will be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. The Prepetition Term Loan Agent and the Prepetition Term Loan Lenders will promptly execute and deliver to the Reorganized Debtor such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtor.

- o *Voting*: Class 4 is Impaired, and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

(e)  Class 5 – Subordinated Notes Claims

- o *Classification*: Class 5 consists of the Subordinated Notes Claims against the Debtor.

- o *Allowance*: On the Effective Date, Subordinated Notes Claims will be deemed Allowed in an aggregate amount equal to $161,636,231.

- o *Treatment*: On the Effective Date, the Distribution Agent will receive for and on behalf of each and every Holder of an Allowed Subordinated Notes Claim who executes and delivers to Holdings a counterpart signature to the Holdings LLC Agreement, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, one hundred percent (100%) of the New Stock, which will be subject to dilution as a result of the Rights Offering and, after giving effect to the Restructuring Transactions, the Equity Incentive Program. The number of shares of New Stock to be issued pursuant to this sub-paragraph will be equal to the excess of the Aggregate Effective Date New Stock Issuance over the aggregate number of

13

Rights Offering Shares. The Distribution Agent will promptly distribute the New Stock on a Pro Rata basis to the Holders of Allowed Subordinated Notes Claims.

o  *Voting*: Class 5 is Impaired, and Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

(f)  Class 6 – General Unsecured Claims

o  *Classification*: Class 6 consists of all General Unsecured Claims against the Debtor.

o  *Treatment*:  Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes Allowed, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 6 Claim, at the election of the Debtor or Reorganized Debtor: (A) its Pro Rata share of the General Unsecured Claims Cash Amount or (B) such other less favorable treatment as to which the Debtor or Reorganized Debtor and the Holder of such Allowed Class 6 Claim shall have agreed upon in writing.

o  *Voting*: Class 6 is Impaired, and Holders of Class 6 Claims will be entitled to vote to accept or reject the Plan.

(g)  Class 7 – Junior Convertible Notes Claims

o  *Classification*:  Class 8 consists of the Junior Convertible Notes Claims against the Debtor.

o  *Treatment*:  On the Effective Date, all Class 9 Junior Convertible Notes Claims will be deemed canceled and will be of no further force and effect, whether surrendered for cancellation or otherwise, and the Holders of such Junior Convertible Notes Claims will not receive any distribution or retain any property on account of such Junior Convertible Notes Claims.  The treatment of the Junior Convertible Notes Claims under the Plan is in accordance with and gives effect to the provisions of Section 510(a) of the Bankruptcy Code.

o  *Voting*:  Class 7 is an Impaired Class, and the Holders of Class 7 Claims will be conclusively deemed to have rejected the Plan.  Therefore, Holders of Class 7 Claims will not be entitled to vote to accept or reject the Plan.

(h)  Class 8 –  Equity Interests

o  *Classification*:  Class 8 consists of the Equity Interests in the Debtor.

o  *Treatment*:  On the Effective Date, all Class 8 Equity Interests will be deemed canceled and will be of no further force and effect, whether surrendered for cancellation or otherwise, and the Holders of such Equity Interests will not receive any distribution or retain any property on account of such Equity Interests.

o  *Voting*:  Class 8 is an Impaired Class, and the Holders of Class 8 Equity Interests will be conclusively deemed to have rejected the Plan.  Therefore, Holders of Class 8 Claims will not be entitled to vote to accept or reject the Plan.

14

3.    **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

4.    **Discharge of Claims**

Except as otherwise provided in the Plan and effective as of the Effective Date: (i) the rights afforded in the Plan and the treatment of all Claims and Equity Interests will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtor or any of its assets, property, or Estate; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtor's liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) all Entities will be precluded from asserting against the Debtor, the Debtor's Estate, the Reorganized Debtor, each of their successors and assigns, and each of their assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

C.    **ACCEPTANCE OR REJECTION OF THE PLAN**

1.    **Presumed Acceptance of Plan**

Classes 1, 2, and 3 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2.    **Voting Classes**

Each Holder of an Allowed Claim as of the applicable Voting Record Date in each of the Voting Classes (Classes 4, 5 and 6) will be entitled to vote to accept or reject the Plan.

3.    **Acceptance by Impaired Classes of Claims**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

4.    **Presumed Rejection of Plan**

Classes 7 and 8 are Impaired and Holders of Class 7 Junior Convertible Notes Claims and Class 8 Equity Interests will receive no distribution under the Plan on account of their Junior Convertible Notes Claims or Equity Interests and are, therefore, presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

5.    **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtor requests confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtor reserves the right to modify the Plan or any Exhibit thereto or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

15

## D.    MEANS FOR IMPLEMENTATION OF THE PLAN

### 1.    General Settlement of Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.

### 2.    Restructuring Transactions

On the Effective Date and without limiting any rights and remedies of the Debtor or Reorganized Debtor under this Plan or applicable law, the Reorganized Debtor shall enter into the Restructuring Transactions as follows:

1.    <u>The First Contribution</u>.  Immediately following the issuance of New Stock pursuant to Article III.B.5(c) of the Plan and the Rights Offering (including the issuance of any Remaining Rights Offering Shares pursuant to the Backstop Rights Purchase Agreement), each holder of any shares of New Stock will, automatically and without any further action on the part of any Person or order of the Bankruptcy Court, be deemed to contribute (the "**First Contribution**") each such share of New Stock issued to such holder pursuant to the Plan to a Delaware limited liability company to be organized to hold, indirectly through Intermediate Holdings (as defined below), 100% of the equity securities of the Debtor as of the Effective Date ("**Holdings**"), in exchange for the issuance by Holdings to each such holder of (x) a number of class A preferred units of Holdings (the "**Class A Preferred Units**") equal to the product obtained by multiplying (A) the aggregate number of Class A Preferred Units to be issued and outstanding by Holdings as of the Effective Date (after giving effect to the restructuring contemplated by the Plan, including the Rights Offering and the transactions contemplated by the Backstop Rights Purchase Agreement) times (B) the quotient obtained by dividing the number of shares of New Stock contributed to Holdings by such holder in the First Contribution, by the aggregate number of shares of New Stock contributed to Holdings in the First Contribution (such quotient, with respect to each such holder, the "**Contribution Percentage**"), and (y) a number of class A common units of Holdings (the "**Class A Common Units**") equal to the product obtained by multiplying (A) the aggregate number of Class A Common Units to be issued and outstanding by Holdings as of the Effective Date (after giving effect to the restructuring contemplated by the Plan, including the Rights Offering and the transactions contemplated by the Backstop Rights Purchase Agreement) times (B) such holder's Contribution Percentage; it being understood, for the avoidance of doubt, that the ratio of Class A Preferred Units to Class A Common Units will be the same with respect to each such holder.  The Class A Preferred Units and Class A Common Units of Holdings issued pursuant to the First Contribution are herein referred to as the "**Post-Effective Date Equity Interests**."  In connection with the receipt by any Person of New Stock on the Effective Date pursuant to this Plan, subject to the Restructuring Transactions, and in connection with the issuance by Holdings to any Person of the Post-Effective Date Equity Interests on the Effective Date, and in each case as a condition thereto, such Person will be required to execute and deliver to Holdings a joinder to the Holdings LLC Agreement.

2.    <u>The Second Contribution</u>.  Immediately following the First Contribution, Holdings will, automatically and without any further action on the part of any Person or order of the Bankruptcy Court, be deemed to contribute (the "**Second Contribution**") each such share of New Stock contributed to Holdings pursuant to the First Contribution to a Delaware corporation to be organized to hold 100% of the equity securities of the Debtor as of the Effective Date ("**Intermediate Holdings**"), in exchange for the issuance by Intermediate Holdings to Holdings of 100% of the common stock, par value $0.01 per share, of Intermediate Holdings ("**Intermediate Holdings Common Stock**"), to be issued and outstanding as of the Effective Date.

The Debtor, Reorganized Debtor, Intermediate Holdings and Holdings reserve the right to consummate other transactions or actions as may be necessary or appropriate to effect a corporate restructuring of the Debtor's business, on notice to the Bankruptcy Court.

RLF1-3427156-2
NY\1558715.7

3.    **Corporate Existence**

The Debtor will continue to exist after the Effective Date as a separate corporate entity, with all the powers of a corporation pursuant to the applicable law in the State of Delaware and pursuant to the Amended Organizational Documents.

4.    **Vesting of Assets in the Reorganized Debtor**

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all property and assets of the Estate (including, without limitation, Causes of Action and, unless otherwise waived pursuant to an order of the Bankruptcy Court, Avoidance Actions) and any property and assets acquired by the Debtor pursuant to the Plan will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances.  Except as may be provided in the Plan, on and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

5.    **Exit Facilities and Sources of Cash for Plan Distributions**

On the Effective Date, the Reorganized Debtor will be authorized to execute and deliver the Revolver Exit Facility Credit Agreement and the Term Loan Exit Facility Credit Agreement, as well as execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the Revolver Exit Facility Credit Agreement or Term Loan Exit Facility Credit Agreement).  Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtor to make payments required pursuant to the Plan will be obtained from the Reorganized Debtor's Cash balances, including Cash from operations, the proceeds of the Rights Offering and the proceeds of the Revolver Exit Facility.  Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtor.

6.    **New Stock**

On the Effective Date, Reorganized Debtor will issue the New Stock to Holders of Allowed Subordinated Notes Claims pursuant to the terms set forth in the Plan.  The New Stock will be subject to dilution by the Rights Offering.  The aggregate number of shares of New Stock to be issued on the Effective Date (after giving effect to all of the transactions contemplated by the Plan, including the Rights Offering) shall be 1,000,000 shares (the "**Aggregate Effective Date New Stock Issuance**").  After giving effect to the Restructuring Transactions, the holders of New Stock will become the holders of the Post-Effective Date Equity Interests, which will be subject to dilution by any equity issued in connection with the Equity Incentive Program.  The Reorganized Debtor will not be obligated to list the New Stock on a national securities exchange, nor will Holdings be obligated to list the Post-Effective Date Equity Interests on a national securities exchange.

7.    **Securityholders Agreement; Registration Agreement**

On the Effective Date, Holdings will be authorized and directed to enter into and consummate the transactions contemplated by the Securityholders Agreement, the Registration Agreement and such documents, and any agreement or document entered into in connection therewith, will become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Securityholders Agreement or the Registration Agreement).  Except for Holdings, entry into the Securityholders Agreement and the Registration

RLF1-3427156-2
NY\1558715.7

Agreement will be voluntary and no Holder of Subordinated Notes Claims will be required, pursuant to the Plan, to enter into such agreements; provided, however, that any Person who, pursuant to Article V.J. hereof or otherwise with the consent of Holdings, enters into the Registration Agreement will also, as a condition thereto, be required to enter into the Securityholders Agreement.

8.     **Rights Offering**

(a)     Issuance of Rights.

Each Rights Offering Participant will receive Subscription Rights to subscribe for its Pro Rata Share of the Rights Offering Shares for an aggregate purchase price equal to the applicable Subscription Payment Amount. In accordance with the Backstop Rights Purchase Agreement, the Backstop Parties have committed to purchase all Remaining Rights Offering Shares. The Rights Offering Shares, including the Remaining Rights Offering Shares, will be issued to the Rights Offering Participants and the Backstop Parties, as applicable, for an aggregate purchase price equal to the Rights Offering Amount.

(b)     Subscription Period.

The Rights Offering will commence on the Subscription Commencement Date and will expire on the Subscription Deadline. Each Rights Offering Participant that intends or desires to participate in the Rights Offering must affirmatively elect to exercise its Subscription Rights, and provide written notice thereof to the Entities specified in the Subscription Form, on or prior to the Subscription Deadline in accordance with the terms of the Plan and the Subscription Form. On the Subscription Deadline, all Remaining Rights Offering Shares will be allocated to, and purchased by, the Backstop Parties in accordance with the terms and conditions of the Backstop Rights Purchase Agreement.

(c)     Exercise of Subscription Rights and Payment of Subscription Payment Amount.

On the Subscription Commencement Date, the Debtor or other applicable Distribution Agent will mail the Subscription Form to each Rights Offering Participant known as of the Rights Offering Record Date, together with appropriate instructions for the proper completion, due execution, and timely delivery of the Subscription Form, as well as instructions for the payment of the eventual Subscription Payment Amount for that portion of the Subscription Rights sought to be exercised by such Person. The Debtor may adopt, with the prior written consent of the Ad Hoc Noteholders Committee, such additional detailed procedures consistent with the provisions of the Plan to more efficiently administer the exercise of the Subscription Rights.

In order to exercise the Subscription Rights, each Rights Offering Participant must return a duly completed Subscription Form (making a binding and irrevocable commitment to participate in the Rights Offering) to the Debtor or other Entity specified in the Subscription Form so that such form is actually received by the Debtor or such other Entity on or before the Subscription Deadline. If the Debtor or such other Entity for any reason does not receive from a given holder of Subscription Rights a duly completed Subscription Form on or prior to the Subscription Deadline, then such holder will be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering. On the Subscription Notification Date, the Debtor will notify each Rights Offering Purchaser of its respective allocated portion of Rights Offering Shares, and in the case of the Backstop Parties, the Debtor will notify each Backstop Party on or before the third (3rd) Business Day after the Subscription Deadline of its portion of the Remaining Rights Offering Shares that such Backstop Party is obligated to purchase pursuant to the Backstop Rights Purchase Agreement. Each Rights Offering Purchaser (other than the Backstop Parties, whose payments will be received by the Debtor on the Effective Date in accordance with the Backstop Rights Purchase Agreement) must tender its Subscription Payment Amount to the Debtor so that it is actually received on or prior to the Subscription Payment Date. In the event the Debtor receives any payments for the exercise of Subscription Rights prior to the Effective Date, such payments shall be held in a separate account until the Effective Date. In the event the conditions to the Effective Date are not met or waived, such payments will be returned, without accrual or payment of any interest thereon, to the applicable Rights Offering Purchaser, without reduction, offset or counter-claim.

18