(d)     Number of Rights Offering Shares.

The number of Rights Offering Shares to be sold pursuant to the Rights Offering will be determined by dividing the Rights Offering Amount by the Subscription Price. The "Subscription Price" means the quotient obtained by dividing the Post-Money Equity Value by the aggregate number of shares of New Stock issued and outstanding on the Effective Date (after giving effect to all of the transactions contemplated by the Plan, including the Rights Offering).

(e)     No Transfer; Detachment Restrictions; No Revocation.

The Subscription Rights are not Transferable or detachable.  Any such Transfer or detachment, or attempted Transfer or detachment, will be null and void and the Debtor will not treat any purported transferee of the Subscription Rights separate from the Subordinated Notes Claims as the holder of any Subscription Rights. Once a Rights Offering Participant has exercised any of its Subscription Rights by properly executing and delivering a Subscription Form to the Debtor or other Entity specified in the Subscription Form, such exercise may only be revoked, rescinded or annulled in the sole discretion of the Debtor or Reorganized Debtor.

(f)     Distribution of Rights Offering Shares.

On, or as soon as reasonably practicable after, the Effective Date, the Reorganized Debtor or other applicable Distributing Agent will distribute the Rights Offering Shares purchased by each Rights Offering Purchaser, which shares will be subject to the Restructuring Transactions.

(g)     Validity of Exercise of Subscription Rights.

All questions concerning the timeliness, validity, form, and eligibility of any exercise, or purported exercise, of Subscription Rights will be determined by the Debtor or Reorganized Debtor.  The Debtor or Reorganized Debtor, in its discretion reasonably exercised in good faith, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. Subscription Forms will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtor or Reorganized Debtor determines in its discretion reasonably exercised in good faith.  The Debtor or Reorganized Debtor will use commercially reasonable efforts to give written notice to any Rights Offering Participant regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Person and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Debtor and Reorganized Debtor nor any of its Related Persons will incur any liability for giving, or failing to give, such notification and opportunity to cure.

(h)     Rights Offering Proceeds.

The proceeds of the Rights Offering will constitute a portion of the Net Exit Proceeds, which will be used to fund Cash payments required to be made under the Plan in accordance with the Payment Waterfall.

9.     **Equity Incentive Program**

As soon as practical after the Effective Date, the Holdings will adopt and implement a post-Effective Date director and officer equity incentive program providing for the issuance from time to time, as approved by the board of managers of Holdings, of Post-Effective Date Equity Interests representing, in the aggregate, up to ten percent (10%) of the common equity interests of Holdings, on a fully-diluted basis, as of the Effective Date.

10.     **Issuance of New Securities and Related Documentation**

On the Effective Date, each of the Reorganized Debtor, Intermediate Holdings and Holdings will be authorized to and will issue, as applicable, the New Stock, the Intermediate Holdings Common Stock and Post-Effective Date Equity Interests and any and all other securities, notes, stock, instruments, certificates, and other

19

documents or agreements required to be issued, executed or delivered pursuant to the Plan (collectively with the Subscription Rights, the "New Securities and Documents"), in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. The issuance of the New Securities and Documents and the distribution thereof under the Plan, and distribution and exercise of the Subscription Rights, will be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, Section 4(2) of the Securities Act and/or other applicable exemptions. Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, including, without limitation, the Revolver Exit Facility Credit Agreement, the Term Loan Exit Facility Credit Agreement, the Registration Agreement, the Securityholders Agreement, and any other agreement or document related to or entered into in connection with any of the foregoing, will become, and the Backstop Rights Purchase Agreement will remain, effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

Upon the Effective Date, after giving effect to the transactions contemplated by the Plan, the authorized capital stock or other equity securities of the Reorganized Debtor will be that number of shares of New Stock as may be designated in the Amended Organizational Documents. Without limiting the effect of section 1145 of the Bankruptcy Code, on the Effective Date, Holdings will enter into the Registration Agreement with each Person (a) who by virtue of the issuance by Holdings to such Person on the Effective Date of the Post-Effective Date Equity Interests and/or its relationship with Holdings could reasonably be deemed to be an "underwriter" or "affiliate" (as such terms are used within the meaning of applicable securities laws) of Holdings, (b) who requests in writing that Holdings execute such agreement, and (c) who enters into the Holdings LLC Agreement and the Securityholders Agreement. In connection with the distribution of Post-Effective Date Equity Interests to current or former employees of the Debtor, Holdings may take whatever actions are necessary to comply with applicable federal, state, local and international tax withholding obligations, including withholding from distributions a portion of the Post-Effective Date Equity Interests and selling such securities to satisfy tax withholding obligations including, without limitation, income, social security and Medicare taxes.

### 11. Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII of the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtor such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtor.

### 12. Certificate of Incorporation and Bylaws

The certificates or articles of incorporation and by-laws of the Debtor will be amended or succeeded, as necessary, to satisfy the provisions of the Plan and the Bankruptcy Code, and will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of New Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan; (iii) to the extent necessary or appropriate, include restrictions on the Transfer of New Stock; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated therein. After the Effective Date, the Reorganized Debtor may amend and restate its certificate or articles of incorporation and by-laws, and other applicable organizational documents, as permitted by applicable law. The Amended Organizational Documents will provide the Reorganized Debtor with the authority to issue shares of New Stock sufficient for the issuance of the shares pursuant to this Plan, inclusive of the Rights Offering Shares, prior to giving effect to the Restructuring Transactions.

13.    **Directors and Officers of the Reorganized Debtor**

The New Board will initially consist of up to four (4) directors, who will consist of the Chief Executive Officer of the Reorganized Debtor and up to three (3) directors to be designated by OCM Principal Opportunities Fund IV Delaware, L.P., and, which directors will be identified in the Plan Supplement as Plan Schedule 3. Any directors elected pursuant to Article V.M of the Plan will be subject to approval of the Bankruptcy Court pursuant to section 1129(a)(5) of the Bankruptcy Code. As of the Effective Date, the initial officers of the Reorganized Debtor will be the officers of the Debtor existing immediately prior to the Effective Date. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtor will disclose, at or prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of directors of the Reorganized Debtor and, to the extent such Person is an insider other than by virtue of being a director, the nature of any compensation for such Person. Each such director and officer shall serve from and after the Effective Date pursuant to applicable law and the terms of the Amended Organizational Documents and the other constituent and organizational documents of the Reorganized Debtor. The existing board of directors of the Debtor will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

14.    **Corporate Action**

Each of the Debtor, the Reorganized Debtor, Intermediate Holdings and Holdings, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtor, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtor the Reorganized Debtor, Intermediate Holdings or Holdings, as applicable or by any other Person (except for those expressly required pursuant to the Plan).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors or members of the Debtor (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, managers or partners of the Debtor, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in the Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, Intermediate Holdings or Holdings, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, Intermediate Holdings or Holdings, as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtor, the Reorganized Debtor, Intermediate Holdings or Holdings, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor, the Reorganized Debtor, Intermediate Holdings and Holdings, as applicable, will be authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtor, the Reorganized Debtor, Intermediate Holdings and Holdings, as applicable, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The secretary and any assistant secretary of the Debtor, the Reorganized Debtor, Intermediate Holdings or Holdings, as applicable, will be authorized to certify or attest to any of the foregoing actions.

15.    **Cancellation of Notes, Certificates and Instruments**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, stock, instruments, certificates, agreements and other documents evidencing the DIP Facility Claims, Prepetition Revolving Credit Agreement Claims, Prepetition Term Loan Credit Facility Claims, Subordinated Notes Claims, the Junior Convertible Notes Claims and the Equity Interests will be canceled, and the obligations of the Debtor thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

On the Effective Date, except to the extent otherwise provided herein, the Indenture and Junior Convertible Notes Indenture will each be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtor thereunder will be fully released, terminated, extinguished and discharged.  The Indenture will continue in effect solely for the purposes of: (1) allowing Holders of the Subordinated Notes Claims to receive distributions under the Plan; and (2) allowing and preserving the rights of the Indenture Trustee to (a) make distributions in satisfaction of Allowed Subordinated Notes Claims, (b) exercise its charging liens against any such distributions, and (c) seek compensation and reimbursement for any fees and expenses incurred in making such distributions.  Upon completion of all such Distributions, the Subordinated Notes and the Indenture will terminate completely.  From and after the Effective Date, the Indenture Trustee will have no duties or obligations under the Indenture other than to make distributions.  As of the Effective Date, the Subordinate Notes will be surrendered to the Indenture Trustee in accordance with the terms of the Indenture.  All surrendered and canceled Subordinated Notes held by the Indenture Trustee will be disposed of in accordance with the applicable terms and conditions of the Indenture.

16.    **Distributions from General Unsecured Claims Cash Amount**

For the purposes of determining distributions to be made from the General Unsecured Claims Cash Amount, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of the General Unsecured Claims Cash Amount, subject to the procedures set forth in Article VIII of the Plan, from the General Unsecured Claims Cash Escrow.

E.    **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

1.    **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtor will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts (including, without limitation, employment agreements) and Unexpired Leases that:

(i)    have been rejected by order of the Bankruptcy Court;

(ii)    are the subject of a motion to reject pending on the Effective Date;

(iii)    are identified on <u>Plan Schedule 4</u> or in the Plan Supplement (in either case which Exhibit may be amended by the Debtor to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court an amended Exhibit and serving it on the affected contract parties at least ten (10) days prior to the Voting Deadline); or

(iv)    are rejected pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan

22

(including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtor's assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Each Executory Contract and Unexpired Lease assumed pursuant to Article VI of the Plan shall revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law

### 2. Assignment of Executory Contracts of Unexpired Leases

In the event of an assignment of an Executory Contract or Unexpired Lease, at least twenty days prior to the Confirmation Hearing, the Debtor will serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and assignment, which will: (a) list the applicable cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtor will file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed cure amounts. Any applicable cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related cure amount must be filed, served and actually received by the Debtor at least five days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease. The Confirmation Order will constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assignment. If an objection to assignment or cure amount is sustained by the Bankruptcy Court, the Reorganized Debtor in its sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

### 3. Rejection of Executory Contracts or Unexpired Leases

All Executory Contracts and Unexpired Leases listed on Plan Schedule 4 will be deemed rejected as of the Effective Date. The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejections described in Article VI of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

### 4. Claims on Account of the Rejection of Executory Contracts or Unexpired Leases

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtor, the Reorganized Debtor or the Estate, and the Debtor, the Reorganized Debtor and their Estate and property shall be forever discharged from any and all

indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X.F of the Plan.

### 5.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. At least twenty (20) days prior to the Confirmation Hearing, the Debtor will file and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, which will: (1) list the applicable cure amount, if any; and (2) describe the procedures for filing objections thereto.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served and actually received by the Debtor at least five (5) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such matters and will be deemed to have forever released and waived any objection to the proposed assumption and cure amount. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. If an objection to Cure is sustained by the Bankruptcy Court, the Debtor or Reorganized Debtor, as applicable, in its sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

### 6.    Assumption of Director and Officer Insurance Policies

The Debtor, and upon the Effective Date, the Reorganized Debtor, will assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan as to which no Proof of Claim need be Filed. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not impair or otherwise modify any rights of the Reorganized Debtor under the D&O Liability Insurance Policies.

### 7.    Indemnification Provisions

Except as otherwise provided in the Plan, all indemnification provisions currently in place (whether in the by-laws, certificate of incorporation, board resolutions, contracts, or otherwise) for the directors, officers and employees of the Debtor who served in such capacity as of the Petition Date with respect to or based upon any act or omission taken or omitted in such capacities, for or on behalf of the Debtor, will be Reinstated (or assumed, as the case may be), and will survive effectiveness of the Plan; provided, however, that no indemnification provisions for any Non-Released Party will survive the Effective Date.

### 8.    Compensation and Benefit Programs

Except as otherwise provided in the Plan, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtor applicable to its employees, retirees, and non-employee directors and the employees and retirees of its subsidiaries, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life, and accidental death and dismemberment insurance plans, are treated as Executory Contracts under the Plan and on the Effective Date will be

24

assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Any payment obligations under any assumed employment contracts and benefit plans that have been or purport to have been accelerated as a result of the commencement of this Chapter 11 Case or the consummation of any transactions contemplated by the Plan will be Reinstated and such acceleration will be rescinded and deemed not to have occurred.

The Debtor established and maintained a pension plan for certain of its employees known as the Dayton Superior Corporation Master Pension Plan (the "Pension Plan"). The Pension Benefit Guaranty Corporation ("PBGC"), a United States Government corporation, guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA. Under the Plan, the Pension Plan will not be terminated, and the Reorganized Debtor will assume and continue to maintain the Pension Plan in accordance with applicable law. Nothing in the Plan will be construed as discharging, releasing, or relieving the Debtor, or its successors, including the Reorganized Debtor, or any party, in any capacity, from any liability for minimum funding under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083 or liability under 2 U.S.C. §§ 1362 and 1307 with respect to the Pension Plan or the PBGC. The PBGC and the Pension Plan will not be enjoined or precluded from seeking to enforce such liability as a result of any provision of the Plan or the Confirmation Order.

### 9. Workers' Compensation Benefits

Except as otherwise provided in the Plan, as of the Effective Date, the Debtor and the Reorganized Debtor will continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtor operates; and (ii) the Debtor's written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance. All such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtor under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

### F. PROVISIONS GOVERNING DISTRIBUTIONS

#### 1. Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the "Treatment" sections in Article III of the Plan or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date will be made on the Initial Distribution Date or as soon thereafter as is practicable. Any distribution to be made on the Effective Date pursuant to the Plan will be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day will be made on the next succeeding Business Day. Distributions on account of Disputed Claims that first become Allowed Claims after the Effective Date shall be made pursuant to Article VIII of the Plan.

#### 2. No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest will not accrue or be paid on any Claims, and no Holder of a Claim (other than a Holder of a DIP Facility Claim or a Prepetition Term Loan Facility Claim with respect to such applicable Claim) will be entitled to interest accruing on or after the Petition Date on any Claim.

#### 3. Distributions by Reorganized Debtor or Other Applicable Distribution Agent

Other than as specifically set forth in the Plan, the Reorganized Debtor or other applicable Distribution Agent will make all distributions required to be distributed under the Plan. Distributions on account of the DIP Facility Claims, Prepetition Term Loan Credit Facility Claims and Subordinated Notes Claims will be made to the

DIP Agent, the Prepetition Term Loan Agent and the Indenture Trustee, respectively. The Reorganized Debtor may employ or contract with other entities to assist in or make the distributions required by the Plan.

4.    **Delivery and Distributions and Undeliverable or Unclaimed Distributions**

(a)    Record Date for Distributions

On the Distribution Record Date, the Claims Register will be closed. Accordingly, the Reorganized Debtor or other applicable Distribution Agent will have no obligation to recognize the Transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute securities, property, notices and other documents only to those Holders of Allowed Claims who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. The Reorganized Debtor or other applicable Distribution Agent will be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the Claims Register, or their books and records, as of the close of business on the Distribution Record Date. For purposes of Subordinated Notes Claims, the record Holder thereof as of the Distribution Record Date will be the Indenture Trustee.

(b)    Delivery of Distributions in General

Except as otherwise provided in the Plan, the Debtor, the Reorganized Debtor or other applicable Distribution Agent, as applicable, will make distributions to Holders of Allowed Claims, or in care of their authorized agents, as appropriate, at the address for each such Holder or agent as indicated on the Debtor's books and records as of the date of any such distribution; *provided, however,* that the manner of such distributions will be determined in the sole discretion of the Debtor or the Reorganized Debtor, as applicable; and *provided further,* that the address for each Holder of an Allowed Claim will be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

All distributions to Holders of Subordinated Notes Claims will be governed by the Indenture and will be deemed completed when made to the Indenture Trustee. The Indenture Trustee may effect any distribution to Holders of Subordinated Notes Claims through the book-entry transfer facilities of The Depository Trust Company, who will distribute the same to its participants in accordance with their respective holdings of Subordinated Notes as of the Distribution Record Date.

(c)    Minimum Distributions

Notwithstanding anything in the Plan to the contrary, no Distribution Agent will be required to make distributions or payments of less than $25.00 (whether in Cash or otherwise) or be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar or share of New Stock under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of New Stock (up or down), with half dollars and half shares of New Stock or less being rounded down.

No Distribution Agent will have any obligation to make a distribution on account of an Allowed Claim if: (a) the aggregate amount of all distributions authorized to be made on the Subsequent Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Subsequent Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $25.00, which shall be treated as an undeliverable distribution under Article VII.D.4 of the Plan.

(d)    Undeliverable Distributions

Holding of Certain Undeliverable Distributions.    If the distribution to any Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable or is otherwise unclaimed, no further distributions will be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then current address, at

26

which time all currently due missed distributions shall be made to such Holder on the next Subsequent Distribution Date. Undeliverable distributions will remain in the possession of the Reorganized Debtor, subject to Article VII.D.4(b) of the Plan, until such time as any such distributions become deliverable. Undeliverable distributions will not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

      <u>Failure to Claim Undeliverable Distributions</u>.  Any Holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a right pursuant to the Plan for an undeliverable or unclaimed distribution within one (1) year after the later of the Effective Date or the date such distribution is due will be deemed to have forfeited its rights for such undeliverable or unclaimed distribution and will be forever barred and enjoined from asserting any such rights for an undeliverable or unclaimed distribution against the Debtor or its Estate, the Reorganized Debtor or its property. In such cases, any Cash for distribution on account of such rights for undeliverable or unclaimed distributions will become the property of the Estates free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any Cash, New Stock and/or other New Securities and Documents or other property held for distribution on account of such Claim will be canceled and of no further force or effect. Nothing contained in the Plan will require the Debtor, Reorganized Debtor, or any Distributing Agent to attempt to locate any Holder of an Allowed Claim.

      <u>Failure to Present Checks</u>.  Checks issued by the Distribution Agent on account of Allowed Claims will be null and void if not negotiated within 180 days after the issuance of such check. In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, no later than 180 days after the issuance of such checks, the Reorganized Debtor will File with the Bankruptcy Court a list of the Holders of any un-negotiated checks. This list will be maintained and updated periodically in the sole discretion of the Reorganized Debtor for as long as the Chapter 11 Case stays open. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 365 days after the date of mailing or other delivery of such check will have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtor or its property. In such cases, any Cash held for payment on account of such Claims shall be property of the Reorganized Debtor, free of any Claims of such Holder with respect thereto. Nothing contained in the Plan will require the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim.

    **5.**      **Compliance with Tax Requirements/Allocations**

      In connection with the Plan and all distributions under the Plan, the Reorganized Debtor or other applicable Distribution Agent will comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under the Plan will be subject to any such withholding and reporting requirements. The Reorganized Debtor or other applicable Distribution Agent will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All persons holding Claims will be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution. Any Cash, New Stock, New Securities and Documents and/or other consideration or property to be distributed pursuant to the Plan will, pending the implementation of such arrangements, be treated as an undeliverable distribution pursuant to Article VII.D.4 of the Plan.

    **6.**      **Allocation of Plan Distributions Between Principal and Interest**

      To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will, to the extent permitted by applicable law, be allocated for income tax purposes to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

7.      **Means of Cash Payment**

Payments of Cash made pursuant to the Plan will be in U.S. dollars and will be made, at the option and in the sole discretion of the Reorganized Debtor, by (a) checks drawn on, or (b) wire transfer from, a domestic bank selected by the Reorganized Debtor.  Cash payments to foreign creditors may be made, at the option of the Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

8.      **Timing and Calculation of Amounts to Be Distributed**

On the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the Subsequent Distribution Date occurring after such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtor will receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims will be made pursuant to the provisions set forth in the applicable class treatment or in Article VIII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims will not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

9.      **Setoffs**

Without altering or limiting any of the rights and remedies of the Debtor and Reorganized Debtor under section 502(d) of the Bankruptcy Code, all of which rights and remedies will be reserved, the Debtor and the Reorganized Debtor may, but will not be required to, withhold (but not setoff except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, Causes of Action and Litigation Claims of any nature that the Debtor or the Reorganized Debtor may hold against the Holder of any such Allowed Claim.  In the event that any such claims, Causes of Action or Litigation Claims are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtor and Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims, Causes of Action or Litigation Claims.  Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtor or the Reorganized Debtor of any such claims, Causes of Action or Litigation Claims.  Notwithstanding anything to the contrary contained in the Plan, the Debtor and the Reorganized Debtor will not offset any amounts against Allowed Subordinated Notes Claims.

10.      **Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by the instruments, securities, notes, or other documentation canceled pursuant to Article V.O of the Plan, the Holder of such Claim will tender the applicable instruments, securities, notes or other documentation evidencing such Claim to the Reorganized Debtor or other applicable Distribution Agent unless waived in writing by the Debtor or the Reorganized Debtor, as applicable.

Any Holder of a Claim that is required, but that fails, to surrender or is deemed to have failed to surrender the applicable note or security required to be tendered under the Plan within one (1) year after the Effective Date will have its Claim and its distribution pursuant to the Plan on account of such Claim discharged and will be forever barred from asserting any such Claim against the Reorganized Debtor or its property.  In such cases, any Cash, New Stock and/or other New Securities and Documents or other property held for distribution on account of such Claim will be canceled and of no further force or effect.

11.      **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim evidenced by a security or note that has been lost, stolen, mutilated, or destroyed shall, in lieu of surrendering such

28

security or note to the extent required by the Plan, deliver to the Reorganized Debtor and other applicable Distribution Agent: (x) evidence reasonably satisfactory to the Reorganized Debtor and other applicable Distribution Agent of such loss, theft, mutilation, or destruction; and (y) such security or indemnity as may be required by the Reorganized Debtor and other applicable Distributing Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim.  Upon compliance with Article VII.K of the Plan as determined by the Debtor or Reorganized Debtor by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to the Reorganized Debtor and other applicable Distribution Agent.

## G.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

### 1.    Resolution of Disputed Claims

#### (a)    Allowance of Claims

After the Effective Date, the Reorganized Debtor will have and will retain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim will become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim.

#### (b)    Prosecution of Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date, the Reorganized Debtor, will have the exclusive authority to File objections to Claims and settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in an Unimpaired Class or otherwise; provided, however, Article VIII.A.2 of the Plan will not apply to Professional Fee Claims. From and after the Effective Date, the Reorganized Debtor may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court. The Reorganized Debtor will have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

#### (c)    Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date, the Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

#### (d)    Deadline to File Objections to Claims

Any objections to Claims must be Filed no later than the Claims Objection Bar Date.  Moreover, notwithstanding the expiration of the Claims Objection Bar Date, the Debtor or Reorganized Debtor will continue to have the right to amend any claims objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is Allowed.

2.      **No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan to the contrary, no payments or distributions of any kind or nature will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim has become an Allowed Claim.

3.      **Distributions on Account of Disputed Claims Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims**

On each Subsequent Distribution Date (or such earlier date as determined by the Reorganized Debtor in its sole discretion), the Reorganized Debtor or other applicable Distribution Agent will make distributions (a) on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, and (b) on account of previously Allowed Claims of property that would have been distributed to the Holders of such Claim on the dates distributions previously were made to Holders of Allowed Claims in such Class had the Disputed Claims that have become Allowed Claims or disallowed by Final Order of the Bankruptcy Court been Allowed or disallowed, as applicable, on such dates. Such distributions will be made pursuant to the applicable provisions of Article III of the Plan.

4.      **Reserve for Disputed General Unsecured Claims**

Prior to making any distributions of Cash to Holders of Allowed General Unsecured Claims from the General Unsecured Claims Cash Escrow, the Reorganized Debtor or other applicable Distribution Agent will establish appropriate reserves for Disputed General Unsecured Claims by withholding from any such distributions an amount equal to one hundred percent (100%) of distributions to which Holders of Disputed General Unsecured Claims would be entitled to under this Plan as of such date as if such Disputed General Unsecured Claims were Allowed in full in the amount asserted by the Holder thereof in its respective timely filed Proof of Claim; provided, however, that the Debtor and the Reorganized Debtor will have the right to file a motion seeking to estimate such amounts. The Reorganized Debtor or other applicable Distribution Agent will also establish appropriate reserves for Disputed Claims in other Classes as it determines necessary and appropriate.

H.      **CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

1.      **Conditions Precedent to Confirmation**

It shall be a condition to confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

- The Bankruptcy Court shall have entered a Final Order, in form and in substance satisfactory to the Debtor and the Ad Hoc Noteholders Committee, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

- The Plan and all schedules, documents, supplements, and exhibits thereto shall have been filed in form and substance acceptable to the Debtor and the Ad Hoc Noteholders Committee.

- The proposed Confirmation Order shall be in form and substance acceptable to the Debtor and the Ad Hoc Noteholders Committee.

- The board of directors of the Reorganized Debtor shall have been selected.

2.      **Conditions Precedent to Consummation**

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

30

- The Confirmation Order shall have been entered and become a Final Order in a form and in substance satisfactory to the Debtor and the Ad Hoc Noteholders Committee and no stay of the Confirmation Order shall have been entered. The Confirmation Order shall provide that, among other things, the Debtor or the Reorganized Debtor, as appropriate, is authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in the Plan.

- The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order) authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtor as contemplated in the Plan and the Plan Supplement

- All documents and agreements necessary to implement the Plan, including, without limitation, the Revolver Exit Facility, the Term Loan Exit Facility and the Backstop Rights Purchase Agreement, in each case in form and substance acceptable to the Debtor and the Ad Hoc Noteholders Committee, shall have (a) been tendered for delivery, and (b) been effected or executed by all Entities party thereto. All conditions precedent all to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All consents, actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

- The Debtor shall have received the Rights Offering Amount, in Cash, net of any fees or expenses authorized by Order of the Bankruptcy Court to be paid from the Rights Offering Amount.

- The Confirmation Date shall have occurred.

### 3.    Waiver of Conditions

The conditions to confirmation of the Plan and to Consummation of the Plan set forth in Article IX of the Plan may be waived by the Debtor with the consent of the Ad Hoc Noteholders Committee (not to be unreasonably withheld) without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan. The failure to satisfy or waive a condition to Consummation may be asserted by the Debtor or the Reorganized Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor or Reorganized Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each right shall be deemed an ongoing right that may be asserted at any time

### 4.    Effect of Non Occurrence of Conditions to Consummation

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or this Disclosure Statement shall: (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtor; (b) prejudice in any manner the rights of the Debtor, any Holders or any other Entity; (c) constitute an Allowance of any Claim or Equity Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any Holders or any other Entity in any respect.

## I.    RELEASE, INJUNCTION AND RELATED PROVISIONS

### 1.    General

Notwithstanding anything in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments under the Plan, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination,

31

section 510 of the Bankruptcy Code or otherwise. Pursuant to the terms contained in the Plan, among other things, the subordination provisions contained in the Indenture will be eliminated and each holder of a Subordinated Notes Claim will receive and be entitled to retain the property as set forth in the Plan. As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments under the Plan will be settled, compromised, terminated and released pursuant to the Plan; provided, however, that nothing contained in the Plan will preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan.

In accordance with the provisions of the Plan, including Article VIII thereof, and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date (1) the Reorganized Debtor may, in its sole and absolute discretion, compromise and settle Claims against it and (2) the Reorganized Debtor may, in its respective sole and absolute discretion, compromise and settle Causes of Action against other Entities.

2.    **Release**

EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH WILL BE CONFIRMED BY THE PLAN, THE DEBTOR AND REORGANIZED DEBTOR, IN THEIR INDIVIDUAL CAPACITY AND AS DEBTOR-IN-POSSESSION, AND THE HOLDERS OF CLAIMS OR EQUITY INTERESTS, AND EACH OF THEIR RESPECTIVE RELATED PERSONS (COLLECTIVELY, THE "RELEASING PARTIES") WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER PROVIDED A FULL DISCHARGE, WAIVER AND RELEASE TO THE RELEASED PARTIES (AND EACH SUCH RELEASED PARTY SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED AND DISCHARGED BY THE RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, LITIGATION CLAIMS AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY IN WHOLE OR IN PART TO THE DEBTOR, THE CHAPTER 11 CASE, THIS DISCLOSURE STATEMENT, THE PLAN OR THE SOLICITATION OF VOTES ON THE PLAN THAT SUCH RELEASING PARTY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF THE DEBTOR, ITS ESTATE OR THE REORGANIZED DEBTOR (WHETHER DIRECTLY OR DERIVATIVELY) AGAINST ANY OF THE RELEASED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT; (II) ANY CAUSES OF ACTION ARISING FROM FRAUD OR WILLFUL MISCONDUCT AS DETERMINED BY FINAL ORDER OF THE BANKRUPTCY COURT OR ANY OTHER COURT OF COMPETENT JURISDICTION; AND/OR (III) THE RIGHTS OF SUCH RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, INDENTURES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT. THE FOREGOING RELEASE SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY

32

CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THIS RELEASE.

### 3.    Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its assets or properties, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate shall be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### 4.    Exculpation

The Exculpated Parties shall neither have nor incur any liability to any Entity for any claims or Causes of Action arising on or after the Petition Date and prior to the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Consummation of the Plan, this Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor, the approval of this Disclosure Statement or confirmation or consummation of the Plan; *provided, however,* that the foregoing provisions shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; *provided, further,* that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; *provided, further, however* that the foregoing provisions shall not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or the Plan Supplement.

### 5.    Preservation of Rights of Action

#### (a)    Maintenance of Causes of Action

Except as otherwise provided in Article X or elsewhere in the Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtor shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action and Litigation Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case. The Reorganized Debtor, as the successors in interest to the Debtor and the Estate, may, and shall have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Litigation Claims without notice to or approval from the Bankruptcy Court.

#### (b)    Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action or Litigation Claim against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), the Debtor expressly reserves such Cause of Action or Litigation Claim for later adjudication by the Debtor or the Reorganized Debtor (including, without limitation, Causes of Action and Litigation Claims not specifically identified or of which the Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believe to exist) and, therefore, no preclusion doctrine,

including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action or Litigation Claims upon or after the confirmation of the Plan or Consummation of the Plan based on this Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action or Litigation Claims have been expressly released in the Plan (including, without limitation, and for the avoidance of doubt, the Release contained in Article X.B of the Plan) or any other Final Order (including, without limitation, the Confirmation Order). In addition, the Debtor and the Reorganized Debtor expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

6.      **Injunction**

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, OR CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION , DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER. BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THIS INJUNCTION. ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASE UNDER SECTION 105 OR 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

J.      **BINDING NATURE OF THE PLAN**

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR, AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (III) FAILED TO VOTE TO ACCEPT OR REJECT HE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

RLF1-3427156-2
NY\1558715.7

**V.**

**CONFIRMATION AND CONSUMMATION PROCEDURES**

**A.      SOLICITATION OF VOTES**

The process by which the Debtor will solicit votes to accept or reject the Plan is summarized in Section I herein titled, "Executive Summary" and set forth in detail in the Disclosure Statement Order, which is attached as <u>Exhibit B</u> to this Disclosure Statement.

**PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT VOTES ARE PROPERLY AND TIMELY SUBMITTED SUCH THAT THEY ARE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN.**

**B.      CONFIRMATION PROCEDURES**

**1.      Confirmation Hearing**

<u>The Confirmation Hearing will commence at 1:30 p.m. prevailing Eastern Time on October 14, 2009</u> before the Honorable Brendan Shannon, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom 1, Wilmington, Delaware 19801-3024. The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtor without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

<u>The Confirmation Objection Deadline is 4:00 p.m. prevailing Eastern Time on October 1, 2009</u>.

All Confirmation Objections must be filed with the Bankruptcy Court and served on the Debtor and certain other parties in accordance with the Disclosure Statement Order on or before the Confirmation Objection Deadline.

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

**2.      Filing Objections to the Plan**

Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim of such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the Notice Parties, as defined in Section I.F herein.

**C.      STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtor believes that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtor has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, the Debtor believes that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

35

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the case, has been or will be disclosed to the Bankruptcy Court, and any such payment: (a) made before the confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after confirmation of the Plan.

- The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in the plan with the Debtor, or a successor to the Debtor under the Plan. The appointment to, or continuance in, such office by such individual, will be consistent with the interests of creditors and equity security holders and with public policy and the Debtor will have disclosed the identity of any insider that the Reorganized Debtor will employ or retain, and the nature of any compensation for such insider;

- Either each Holder of an Impaired Claim will have accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on that date under chapter 7 of the Bankruptcy Code;

- Each Class of Claims that is entitled to vote on the Plan will either have accepted the Plan or will not be Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable, and that Priority Tax Claims will be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code;

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class;

- Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor thereto under the Plan;

- The Debtor has paid or will pay all fees payable under section 1930 of title 28, and the Plan provides for the payment of all such fees on the Effective Date; and

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits.

1.    **Best Interests of Creditors Test/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor is liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (a) estimate the Cash liquidation proceeds that a chapter 7 trustee would generate if the Chapter 11 Case were converted to a chapter 7 case and the assets of the Debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would

36

receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the Plan that such holder would receive if the Plan were confirmed.

In chapter 7 cases, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid in full: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

Accordingly, the Cash amount that would be available for satisfaction of Claims (other than Secured Claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtor, augmented by the unencumbered Cash held by the Debtor at the time of the commencement of the liquidation. Such Cash would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from termination of the Debtor's business and the use of chapter 7 for purposes of a liquidation.

As described in more detail in the Liquidation Analysis, the Debtor believes that confirmation of the Plan will provide each Holder of an Allowed Claim or Equity Interest in each Class with a recovery greater than or equal to the value of any distributions if the Chapter 11 Case were converted to a case under chapter 7 of the Bankruptcy Code because, among other reasons, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale of the Debtor's assets and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution. In addition, distributions in a chapter 7 case may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions. In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Case and the Claims against the Debtor. As set forth in the Liquidation Analysis, Holders of Class 7 Junior Convertible Notes and Class 8 Equity Interests would not receive any recovery under a chapter 7 liquidation, so the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code with respect to such Classes.

2.    **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the Reorganized Debtor or the need for further financial reorganization, unless the plan contemplates such liquidation. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtor has analyzed the ability of the Reorganized Debtor to meet its obligations under the Plan and to retain sufficient liquidity and capital resources to conduct its business.

The Debtor believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtor analyzed its ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources. The Debtor's management, with the assistance of its financial advisors, developed a business plan and prepared financial projections for fiscal years 2009 through 2014 (the "Financial Projections"). The Financial Projections, together with the assumptions on which they are based, are attached hereto as Exhibit C.

In general, as illustrated by the Financial Projections, the Debtor believes that with the significantly de-leveraged capital structure provided under the Plan, the Reorganized Debtor should have sufficient Cash flow and availability to make all payments required pursuant to the Plan while conducting ongoing businesses operations. The Debtor believes that confirmation and Consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtor. Accordingly, the Debtor believes that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL

BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. THE DEBTOR MAKES NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS.

The Financial Projections have not been examined or compiled by independent accountants. The Debtor makes no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results. Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtor and its management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the 5-year period of the Financial Projections may vary from the projected results and the variations may be material. All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the financial projections are based in connection with their evaluation of the Plan.

THE ESTIMATED GOING CONCERN ENTERPRISE VALUE OF THE REORGANIZED DEBTOR SET FORTH IN EXHIBIT D HERETO REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED DEBTOR, WHICH ASSUMES THAT THE REORGANIZED DEBTOR CONTINUES AS AN OPERATING BUSINESS. THE ESTIMATED GOING CONCERN ENTERPRISE VALUE OF THE REORGANIZED DEBTOR SET FORTH IN EXHIBIT D HERETO DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTOR, ITS SECURITIES OR ITS ASSETS, WHICH VALUE MAY BE SIGNIFICANTLY HIGHER OR LOWER THAN THE ESTIMATE SET FORTH IN EXHIBIT D HERETO. ACCORDINGLY, SUCH ESTIMATED GOING CONCERN ENTERPRISE VALUE IS NOT NECESSARILY INDICATIVE OF THE PRICES AT WHICH THE NEW STOCK OR OTHER SECURITIES OF THE REORGANIZED DEBTOR MAY TRADE AFTER GIVING EFFECT TO THE REORGANIZATION SET FORTH IN THE PLAN, WHICH PRICES MAY BE SIGNIFICANTLY HIGHER OR LOWER THAN INDICATED BY SUCH ESTIMATE.

### 3.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Claims in Class 1, 2 and 3 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan.

Claims in Classes 4, 5 and 6 are Impaired under the Plan, and as a result, the Holders of Claims in such Classes are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class

(other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

Claims in Class 7 and Class 8 Equity Interests are impaired and deemed to have rejected the Plan.. The Debtor, therefore, will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code as more fully described below.

### 4. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, provided that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtor's request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

### 5. No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 6. Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

- Secured Claims. The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

- Unsecured Claims. The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

- Equity Interests. The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:

  o  the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or

39

    o    if the class does not receive the amount required in the paragraph directly above, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

**As noted above, the Debtor will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Classes 7 and 8.** To the extent that any of the Voting Classes vote to reject the Plan, the Debtor further reserves the right to seek (a) confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XII of the Plan.

The votes of Holders of Claims in Class 7 and Equity Interests in Class 8 are not being solicited because, under Article III of the Plan, there will be no distribution to such Holders and, therefore, such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. All Class 7 Claims and Class 8 Equity Interests will be deemed canceled and will be of no further force and effect, whether surrendered for cancellation or otherwise.

Notwithstanding the deemed rejection by Classes 7 and 8 or any Class that votes to reject the Plan, the Debtor does not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests. The Debtor believes that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

## D.    CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date. For a more detailed discussion of the conditions precedent to the consummation of the Plan and the impact of failure to meet such conditions, see Article IX.B of the Plan.

RLF1-3427156-2
NY\1558715.7

**VI.**
**PLAN-RELATED RISK FACTORS**

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH DAYTON SUPERIOR'S BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

A.    **CERTAIN BANKRUPTCY LAW CONSIDERATIONS**

1.    **Parties in Interest May Object to the Debtor's Classification of Claims and Equity Interests; Payment of Postpetition Fees and Expenses of Indenture Trustee Under Junior Convertible Notes Indenture**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Specifically, the indenture trustee under the Junior Convertible Notes Indenture asserts that the Plan improperly classifies General Unsecured Claims in Class 6 and Junior Convertible Notes Claims in Class 7.  The indenture trustee asserts that all such claims should be classified together in Class 6 because they are substantially similar to the other claims in such class.  The Debtor disputes this assertion by the indenture trustee and believes that the Plan's classification structure is appropriate.  The indenture trustee further asserts that its postpetition reasonable fees and expenses, including, without limitation, professional fees and expenses, should be allowed as Administrative Claims and paid in full in cash on the Effective Date.  The Debtor disputes this assertion.

2.    **The Debtor May Fail to Satisfy the Vote Requirement.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtor may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

3.    **The Debtor May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy

41

Rules. Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtor, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4.    Non-Consensual Confirmation of the Plan May Be Necessary.

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtor believes that the Plan satisfies these requirements and the Debtor may request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, in the event that a Voting Class does not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### 5.    The Debtor May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtor and Reorganized Debtor reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is or may become subject to an objection. Any Holder of a Claim that is or may become subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 6.    There Exists a Risk of Not Obtaining the Revolver Exit Facility.

The Plan is predicated on, among other things, obtaining the Revolver Exit Facility. The Debtor has not yet received a commitment with respect to the Revolver Exit Facility and there can be no assurance that the Debtor will be able to obtain the Revolver Exit Facility.

### 7.    There Exists a Risk of Not Obtaining the Term Loan Exit Facility

The Plan is predicated on, among other things, obtaining the Term Loan Exit Facility. The Term Loan Exit Facility is subject to certain conditions precedent which must be satisfied prior to closing, including, but not limited to, a requirement to pay all reasonable accrued and unpaid expenses (whether accrued prepetition or postpetition) of the Prepetition Term Loan Lenders and the Prepetition Term Loan Agent (including, but not limited to, all reasonable unpaid fees and expenses (whether accrued prepetition or postpetition) of Gibson, Dunn & Crutcher, LLP, Broadpoint Capital, Inc. and Young Conaway Stargatt & Taylor, LLP). There can be no assurance that the conditions precedent to the Term Loan Exit Facility will be satisfied.

8.   **There Exists a Risk of Not Obtaining the Rights Offering Amount.**

The Plan is predicated on, among other things, the Debtor's receipt of the Rights Offering Amount. Notwithstanding the Backstop Rights Purchase Agreement, because the Rights Offering has not been completed, there can be no assurance that the Debtor will receive any or all of the Rights Offering Amount.

9.   **The Effective Date May Not Occur.**

Although the Debtor believes that the Effective Date may occur quickly after the confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

10.   **Contingencies Will Not Affect Validity of Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Voting Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

B.   **RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER THE PLAN**

1.   **The Valuation of the Reorganized Debtor May Not Be Adopted by the Bankruptcy Court.**

The approximate midpoint equity value of the Reorganized Debtor (after taking into account the Rights Offering) set forth in the valuation included as Exhibit D to this Disclosure Statement is $146.5 million. Parties in interest in this Chapter 11 Case may oppose confirmation of the Plan by alleging that the midpoint equity value of the Reorganized Debtor is higher than such amount and that the Plan thereby improperly limits or extinguishes their rights to recoveries under the Plan. At the confirmation Hearing, the Bankruptcy Court will hear evidence regarding the views of the Debtor and opposing parties, if any, with respect to the valuation of the Reorganized Debtor. Based on that evidence, the Bankruptcy Court will determine the appropriate valuation for the Reorganized Debtor for purposes of the Plan.

2.   **There May Be a Lack of a Trading Market For the New Stock.**

It is anticipated that there will be no active trading market for the New Stock. The Reorganized Debtor has no present intention to register any of the securities under the Securities Act, nor to apply to list any of the securities on any national securities exchange. Accordingly, there can be no assurance that any market will develop or as to the liquidity of any market that may develop for any such securities. In addition, the Reorganized Debtor will not be required to file reports with the Commission or otherwise provide financial or other information to the public which may further impair liquidity and prevent brokers or dealers from publishing quotations.

3.   **The Reorganized Debtor May Not Be Able to Achieve Projected Financial Results or Service Its Debt.**

Although the Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtor, there is no guarantee that the Financial Projections will be realized. The Reorganized Debtor may not be able to meet its projected financial results or achieve projected revenues and Cash flows assumed in projecting future business prospects. To the extent the Reorganized Debtor does not meet its projected financial results or achieve projected revenues and Cash flows, the Reorganized Debtor may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service its debt obligations as they come due or may not be able to meet its operational needs. Any one of these failures may preclude the Reorganized Debtor from, among other things: (a) enhancing its current customer offerings; (b) taking advantage of future opportunities; (c) growing its business; or (d) responding to competitive pressures. Further, a failure of the Reorganized Debtor to meet its projected financial results or achieve projected

43

revenues and Cash flows could lead to Cash flow and working capital constraints, which constraints may require the Reorganized Debtor to seek additional working capital.  The Reorganized Debtor may not be able to obtain such working capital when it is required.

4. **The Estimated Valuation of the Reorganized Debtor and the New Stock and the Estimated Recoveries to Holders of Allowed Claims Are Not Intended to Represent the Private or Public Sale Values of the New Stock.**

The Debtor's estimated recoveries to Holders of Allowed Claims are not intended to represent the private or public sale values of the Reorganized Debtor's securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which is beyond the control of Reorganized Debtor), including, without limitation:  (a) the successful reorganization of the Debtor; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtor's ability to achieve the operating and financial results included in the Financial Projections; and (d) the Debtor's ability to maintain adequate liquidity to fund operations.

5. **The Ad Hoc Noteholders Committee Will Control the Reorganized Debtor.**

Consummation of the Plan will result in a small number of holders owning a significant percentage of the shares of outstanding New Stock, with the Ad Hoc Noteholders Committee holding a controlling percentage of the New Stock.  These holders will, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtor.

6. **The Issuance of Equity Interests to Debtor's Management May Dilute the Equity Ownership Interest of Other Holders of the New Stock.**

It is anticipated that the New Board will adopt the Equity Incentive Program for directors and management, consisting of grants representing up to 10% of the fully-diluted equity of the Reorganized Debtor. If the New Board distributes equity interests, or options to acquire such equity interests, to directors, management or employees, it is contemplated that such distributions will dilute the New Stock issued on account of Claims under the Plan and the ownership percentage represented by the New Stock distributed under the Plan.

7. **It is Unlikely That the Debtor Will Pay Dividends In the Foreseeable Future.**

All of the Reorganized Debtor's cash flow will be required to be used in the foreseeable future (a) to make payments under the Exit Facilities, (b) to fund the Reorganized Debtor's other obligations under the Plan, and (c) for working capital and capital expenditure purposes.  Accordingly, the Reorganized Debtor does not anticipate paying cash dividends on the New Stock in the foreseeable future.

C. **RISK FACTORS THAT COULD NEGATIVELY IMPACT THE DEBTOR'S BUSINESS**

1. **The Non-Residential Construction Industry is Cyclical.**

The non-residential construction industry is cyclical, and the downturn in the non-residential construction industry has caused a decline in the demand for the Debtor's products.  The Debtor's products are primarily used in domestic, non-residential construction; therefore its sales and earnings are strongly influenced by non-residential construction activity, which historically has been cyclical.  Most recently, during 2007, 2008 and the first two quarters of 2009, the non-residential construction market severely constricted and as a result, the Debtor's revenue was negatively affected. Non-residential construction activity can decline because of many factors the Debtor cannot control, such as a decline in general economic activity, a decrease in government spending on construction projects, an increase in raw material and overall construction costs and interest rate increases, which make borrowings used to finance construction projects more expensive, and changes in banking and tax laws, which may reduce incentives to begin construction projects.

44

2.    **Seasonal Demand.**

Due to weather, the non-residential construction industry is seasonal in most of North America. Demand for the Debtor's products generally is higher in the spring and summer than in the winter and late fall. As a result, the Debtor's first quarter net sales and income from operations typically are the lowest of the year. The Debtor's net sales and income from operations in the fourth quarter are also generally less than in the second and third quarters. Consequently, the Debtor's working capital requirements related to accounts receivable and inventories tend to be higher in the second and third quarters and, accordingly, can adversely affect the Debtor's liquidity and cash flow. Adverse weather, such as unusually prolonged periods of cold, rain, blizzards, hurricanes and other severe weather patterns, could delay or halt construction activity over wide regions of the country. A severe winter could lead to reduced construction activity and thus magnify the seasonal decline in the Debtor's revenues and earnings during the winter months. Sustained extreme adverse weather conditions could have a material adverse effect on the Debtor's business, financial condition, results of operations, and cash flows.

3.    **Increased Costs of Raw Materials and Energy Resources.**

Significant variations in the costs, quality, and availability of raw materials and energy may negatively affect the Debtor's results of operations and cash flows. Steel, in its various forms, is the Debtor's principal raw material, constituting approximately 30% of the Debtor's product cost of sales in 2008. Any decrease in the Debtor's volume of steel purchases could affect the Debtor's ability to secure volume purchase discounts that the Debtor has obtained in the past. In addition, an overall increase in energy costs, including the cost of natural gas and petroleum products, could adversely impact the Debtor's overall operating costs in the form of higher raw material, utilities, and freight costs. The Debtor typically does not enter into forward contracts to hedge commodity price risks that it faces. Even though the Debtor's costs may increase, its customers may not accept corresponding price increases for the Debtor's products, or the prices for the Debtor's products may decline. The Debtor's ability to achieve acceptable margins is principally dependent on managing its cost structure and managing changes in raw materials prices, which fluctuate based upon factors beyond the Debtor's control. If the prices of the Debtor's products decline, or if its raw material costs increase, such changes could have a material adverse effect on its operating margins and profitability.

4.    **Losing Certain Key Customers.**

The Debtor's top ten customers accounted for 26% of the Debtor's net sales for the year ended December 31, 2008 and its largest customer accounted for 5%, 6%, and 7% of net sales for the years ended December 31, 2008, 2007, and 2006, respectively. The loss of any of these customers could have a material adverse effect on the Debtor's revenue and could also adversely affect its liquidity and cash flow from operating activities. Further, increasing consolidation of the Debtor's customers may negatively affect earnings. The Debtor believes there is an increasing trend among its distributor customers to consolidate into larger entities. As the Debtor's customers increase in size and gain market power, they may be able to exert pressure on the Debtor to reduce prices or increase price competition by dealing more readily with the Debtor's competitors. If the consolidation of the Debtor's customers does result in increased price competition, sales and profit margins may be adversely affected.

5.    **Environmental Investigation, Remediation, and Compliance Costs.**

The Debtor's business and its facilities are subject to a number of federal, state, and local environmental laws and regulations that govern, among other things, the discharge of hazardous materials into the air and water as well as the use, generation, handling, storage, transport and disposal of these materials. Many of these laws and regulations provide for substantial fines and criminal sanctions for violations. Permits are required for operation of the Debtor's businesses (particularly air emission permits), and these permits are subject to renewal, modification and, in certain circumstances, revocation. Pursuant to certain environmental laws, a current or previous owner or operator of land may be liable for the costs of investigation and remediation of hazardous materials at the property. These laws can often impose liability whether or not the owner or operator knew of, or was responsible for, the presence of any hazardous materials. Persons who arrange (as defined under these statutes) for the disposal or treatment of hazardous materials also may be liable for the costs of investigation and remediation of these substances at the disposal or treatment site, regardless of whether the affected site is owned or operated by them. The Debtor may be liable for costs under certain environmental laws even if it does not cause the condition causing

45

such liability. Changes in environmental laws or unexpected investigations could adversely affect the Debtor's business. Since the Debtor owns and operate a number of facilities where industrial activities have been historically conducted and because the Debtor arranges for the disposal of hazardous materials at many disposal sites, the Debtor may incur costs for investigation and remediation, as well as capital costs associated with compliance with these laws. More stringent environmental laws as well as more vigorous enforcement policies or discovery of previously unknown conditions requiring remediation could impose material costs and liabilities on the Debtor which could have a material adverse effect on its business, financial condition, results of operations, and cash flows.

6.      **The Debtor's Mexican Operations and Foreign Sourcing Relationships Are Subject to Local Business Risks.**

The Debtor operates a manufacturing facility in Reynosa, Mexico and purchase finished goods from China and other foreign sources. The success of both the Debtor's operations in Mexico and the Debtor's foreign sourcing initiatives depend on numerous factors, many of which are beyond the Debtor's control, including general economic conditions, restrictions on the repatriation of assets, compliance with foreign laws and standards and political risks. The Debtor's Mexican operations and foreign outsourcing relationships are affected directly and indirectly by global regulatory, economic, and political conditions. There are no assurances that the Debtor will succeed in developing and implementing policies and strategies to counter such conditions effectively in each location where it does business. Some or all of these factors may have a material adverse effect on the Debtor's operations or upon its financial condition, results of operations, and cash flows in the future.

7.      **Competition.**

The markets in which the Debtor competes are highly competitive. Many of the markets in which the Debtor operates are served by numerous competitors, ranging from multi-regional companies to small, independent businesses with a limited number of locations. The Debtor generally competes on the basis of, among other things: price, quality, breadth of product offering, distribution capabilities (including quick delivery times), customer service, and expertise. However, the uniformity of products among the Debtor's competitors results in substantial pressure on pricing and profit margins. As a result of these pricing pressures, the Debtor may experience reductions in the profit margins on sales, or may be unable to pass any cost increases on to customers. The Debtor cannot promise that it will be able to maintain or increase the current market share of its products or compete successfully in the future. If competitive pressures were to cause the Debtor to reduce prices, its operating margins may be adversely impacted. If the Debtor were to maintain its prices in the face of price reductions by its competitors, the Debtor's net sales could decline. The Debtor may encounter increased competition from existing competitors or new market entrants in the future, which could have a material adverse effect on the Debtor's business, financial condition, results of operations, and cash flows.

8.      **Labor Disputes.**

The Debtor depends on its highly trained employees, and any work stoppage or difficulty hiring similar employees would adversely affect the Debtor's business. The Debtor could be adversely affected by a shortage of skilled employees. As of the Petition Date, approximately 29% of the Debtor's employees were unionized. The Debtor is subject to several collective bargaining agreements with employees at its Miamisburg, Ohio; Parsons, Kansas; Elk Grove, Illinois; New Braunfels, Texas; Tremont, Pennsylvania; City of Industry, California; and Aurora, Illinois facilities. These collective bargaining agreements are scheduled to terminate beginning in April 2009 through June 2011, and the Debtor cannot offer assurances that it will be able to negotiate a satisfactory renewal of these collective bargaining agreements or that its employee relations will remain stable. Any shortage of labor could have a material adverse effect on the Debtor's business, financial condition, results of operations, and cash flows.

9.      **Restrictive Covenants.**

The Exit Facilities will contain various provisions which may limit the discretion of the Reorganized Debtor's management by its ability to, among other things, incur additional indebtedness, incur liens, pay dividends or make certain restricted payments, consummate certain asset sales, enter into certain transactions with affiliates,

46

merge, consolidate and/or sell or dispose of all or substantially all of the assets. In addition, it is expected that the Exit Facilities will require the Reorganized Debtor to meet certain financial covenants set forth therein.

Any failure to comply with the restrictions of the Exit Facilities or any other subsequent financing agreements may result in an event of default. An event of default may allow the creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies. If the Reorganized Debtor is unable to repay amounts outstanding under the Exit Facilities when due, the lenders thereunder could, subject to the terms of the relevant agreements, seek to sell or otherwise transfer the assets that are pledged to secure the indebtedness outstanding under such facility and notes. Substantially all of the assets of the Reorganized Debtor will be pledged as security under the Exit Facilities.

10.    **Tax Implications.**

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtor currently does not intend to seek any ruling from the IRS on the tax consequences of the Plan. Even if the Debtor decides to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date. In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request. **Thus, there can be no assurance that the IRS will not challenge the various positions the Debtor has taken, or intends to take, with respect to the tax treatment in the Plan, or that a court would not sustain such a challenge.**

11.    **Loss of Key Personnel.**

The Debtor's success depends to a significant degree upon the continued contributions of its senior management, many of whom would be difficult to replace. Generally, these employees may voluntarily terminate their employment at any time. In such event, the Debtor may not be able to successfully retain existing personnel or identify, hire and integrate new personnel. Accordingly, it is possible that the Debtor's business would be materially adversely affected if one or more of these key individuals left. The Debtor does not maintain any key-man or similar insurance policies covering any its senior management or key personnel.

12.    **Product Liability and Construction-Related Risks.**

The Debtor's products are used in various construction projects, and defects in its products could result in claims for personal injury or death and property damage. While the Debtor maintains insurance to cover these claims, it is possible that existing or future claims will exceed the Debtor's insurance coverage. In addition, it is possible that third-party insurance will not continue to be available to the Debtor on economically reasonable terms. Claims brought against the Debtor that are not covered by insurance could have a material adverse effect on its operating results and financial condition. The Debtor's operations are subject to hazards inherent in the construction industry that could result in personal injury or death, work stoppage or serious damage to the Debtor's equipment or to the property of its customers. To protect itself against such casualty and liability risks, the Debtor maintains an insurance program. In general, the Debtor's deductibles per incident are $500,000 for general liability, $350,000 for workers' compensation liability and $1,000 for automobile liability. In addition, the Debtor maintains a one-time annual deductible of $4.0 million for general liability and $5.0 million for workers' compensation liability coverage. The Debtor maintains outside insurance for such liability in excess of these deductibles. The Debtor's deductibles may cause the Debtor to incur significant costs. If the Debtor's insurance premiums or other costs rise significantly in the future, its profitability could be reduced.

D.    **RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS**

1.    **The Financial Information Contained Herein Is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit Was Performed.**

**The financial information contained in this Disclosure Statement has not been audited.** In preparing this Disclosure Statement, the Debtor relied on financial data derived from its books and records that was available at the time of such preparation. Although the Debtor has used their reasonable business judgment to ensure the

47

accuracy of the financial information provided in this Disclosure Statement, and while the Debtor believes that such financial information fairly reflects the financial condition of the Debtor, the Debtor is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

2.    **Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.**

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtor's operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtor may turn out to be different from the financial projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtor, some of which may not materialize, including, without limitation, assumptions concerning:    (a) the timing of confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtor, including, without limitation, the Debtor's ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtor's ability to maintain market strength and receive vendor support by way of favorable purchasing terms; and (f) consumer preferences continuing to support the Debtor's business plan.

DUE TO THE INHERENT UNCERTAINTIES ASSOCIATED WITH PROJECTING FINANCIAL RESULTS GENERALLY, THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSIDERED ASSURANCES OR GUARANTEES OF THE AMOUNT OF FUNDS OR THE AMOUNT OF CLAIMS THAT MAY BE ALLOWED IN THE VARIOUS CLASSES.  WHILE THE DEBTOR BELIEVES THAT THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE REASONABLE, THERE CAN BE NO ASSURANCE THAT THEY WILL BE REALIZED.

E.    **DISCLOSURE STATEMENT DISCLAIMER**

1.    **The Information Contained Herein Is for Soliciting Votes Only.**

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purposes.

2.    **This Disclosure Statement Was Not Approved by the Securities and Exchange Commission.**

This Disclosure Statement has not been filed with the Commission or any state regulatory authority. Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

3.    **The Debtor Relied on Certain Exemptions from Registration Under the Securities Act.**

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws.  The offer of New Stock to Holders of Claims in Class 5 has not been registered under the Securities Act or similar state securities or "blue sky" laws.  To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable nonbankruptcy law, the issuance of the New Stock (including Rights Offering Shares) or any shares reserved for issuance under the Equity Incentive Program, will be exempt from registration under the Securities Act by virtue of

48

section 1145 of the Bankruptcy Code, section 4(2) of the Securities Act or Rule 701 promulgated under the Securities Act.

4. **This Disclosure Statement Contains Forward Looking Statements.**

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

5. **No Legal or Tax Advice Is Provided to You by this Disclosure Statement.**

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

6. **No Admissions Are Made by This Disclosure Statement.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, the Reorganized Debtor, Holders of Allowed Claims or Equity Interests or any other parties in interest.

7. **No Reliance Should be Placed on any Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtor or the Reorganized Debtor may seek to investigate, File and prosecute Claims and Equity Interest and may object to Claims after the confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims or objections to Claims.

8. **Nothing Herein Constitutes a Waiver of any Right to Object to Claims or Recover Transfers and Assets.**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtor or the Reorganized Debtor (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtor or its Estate are specifically or generally identified herein.

9. **The Information Used Herein Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors.**

Counsel to and other advisors retained by the Debtor have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by

49

the Debtor have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

10. **The Potential Exists for Inaccuracies, and the Debtor Has No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtor has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtor nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtor may subsequently update the information in this Disclosure Statement, the Debtor has no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11. **No Representations Made Outside the Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtor, the Chapter 11 Case or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtor, the counsel to the Committee and the United States Trustee.

RLF1-3427156-2
NY\1558715.7

**VII.**
**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

**A.     LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

If no chapter 11 plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtor's assets. A discussion of the effect that a chapter 7 liquidation would have on the recovery of holders of Claims is set forth in Section V.C herein, titled "Statutory Requirements for Confirmation of the Plan." In performing the liquidation analysis, the Debtor has assumed that all Holders of Claims will be determined to have "claims" that are entitled to share in the proceeds from any such liquidation. The Debtor believes that liquidation under chapter 7 would result in (i) smaller or equal distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtor's operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtor's assets.

**B.     FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION**

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtor's business or an orderly liquidation of the Debtor's assets. During the negotiations prior to the filing of the Plan, the Debtor explored various alternatives to the Plan.

The Debtor believes that the Plan enables the Debtor to emerge from chapter 11 successfully and expeditiously, preserves its business and allows creditors to realize the highest recoveries under the circumstances. In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtor would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed. Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation. Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtor believes that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors.

Moreover, the prolonged continuation of the Chapter 11 Case is likely to adversely affect the Debtor's business and operations. So long as the Chapter 11 Case continues, senior management of the Debtor will be required to spend a significant amount of time and effort dealing with the Debtor's reorganization instead of focusing exclusively on business operations. Prolonged continuation of the Chapter 11 Case will also make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtor's business. In addition, the longer the Chapter 11 Case continues, the more likely it is that the Debtor's customers, suppliers, distributors, and agents will lose confidence in the Debtor's ability to reorganize their business successfully and will seek to establish alternative commercial relationships. Furthermore, so long as the Chapter 11 Case continues, the Debtor will be required to incur substantial costs for professional fees and other expenses associated with the proceedings. The prolonged continuation of the Chapter 11 Case may also require the Debtor to seek additional financing, either under the DIP Facility or otherwise, in order to service its debt and other obligations. It may not be possible for the Debtor to obtain additional financing during the pendency of the Chapter 11 Case on commercially favorable terms or at all. If the Debtor was to require additional financing during the Chapter 11 Case and was unable to obtain the financing on favorable terms or at all, it is unlikely the Debtor could successfully reorganize.

51

# VIII.
## EXEMPTIONS FROM SECURITIES ACT REGISTRATION

### SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(2) OF THE SECURITIES ACT

**1.    New Stock Issued in Reliance on Section 1145 of the Bankruptcy Code**

Under the Plan, 100% of the New Stock will be issued to Holders of Subordinated Notes Claims (other than (i) New Stock to be issued pursuant to the Rights Offering and (ii) any equity to be issued pursuant to the Equity Incentive Program) in reliance upon section 1145 of the Bankruptcy Code (the "**1145 Securities**"). Section 1145 of the Bankruptcy Code provides that the securities registration requirements of federal and state securities laws do not apply to the offer or sale of stock, warrants or other securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of securities hold a claim against, an interest in or claim for administrative expense against the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are reissued principally in such exchange and partly for Cash and property.

Such securities may be resold without registration under either (a) state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states or (b) the Securities Act pursuant to an exemption provided by section 4(1) of the Securities Act unless the holder is an "underwriter" (as such term is defined in the Bankruptcy Code) with respect to the securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (a) with a view to distributing those securities and (b) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in the Securities Act.

The term "issuer" is defined in section 2(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with, an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of the securities of a reorganized debtor may be presumed to be a "control person."

**2.    Rights Offering Shares Issued in Reliance on Section 4(2) of the Securities Act**

The Debtor believes that the Rights Offering Shares to be issued in connection with the Rights Offering, as provided under the Plan, will be exempt from the registration requirements of the Securities Act, pursuant to section 4(2) of the Securities Act, as transactions by an issuer not involving any public offering, and equivalent exemptions in state securities laws.

52

3.      **Resales of New Stock**

To the extent that persons who receive Rights Offering Shares and persons who receive 1145 Securities are deemed to be "underwriters" (collectively, the "**Restricted Holders**"), resales by Restricted Holders would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Restricted Holders would, however, be permitted to sell New Stock or other securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below, or if such securities are registered with the Commission pursuant to the Registration Agreement or otherwise. Any person who is an "underwriter" but not an "issuer" with respect to an issue of securities is, in addition, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b)(1) of the Bankruptcy Code.

4.      **Rule 144**

Under certain circumstances, Holders of 1145 Securities deemed to be "underwriters" or holders of Rights Offering Shares may be entitled to resell their securities pursuant to the limited safe harbor resale provisions under Rule 144 of the Securities Act, to the extent available and in compliance with applicable state and foreign securities laws.

Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the Commission. However, the Reorganized Debtor does not presently intend to make publicly available the requisite current information regarding the Reorganized Debtor, and as a result, Rule 144 will not be available for resales of New Stock by Restricted Holders

Pursuant to the Plan, certificates evidencing 1145 Securities or Rights Offering Shares received by Restricted Holders or by a holder that the Debtor determines is an underwriter within the meaning of section 1145 of the Bankruptcy Code will bear a legend substantially in the form below:

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>ACT</u>"), OR APPLICABLE STATE SECURITIES LAWS ("<u>STATE ACTS</u>") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS COVERING SUCH SECURITIES OR THE SECURITIES ARE SOLD AND TRANSFERRED IN A TRANSACTION THAT IS EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT."

**WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF THE REORGANIZED DEBTOR WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON. ACCORDINGLY, THE DEBTOR EXPRESSES NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE." IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTOR, THE DEBTOR MAKES NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES OF THE REORGANIZED DEBTOR. ACCORDINGLY, THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

RLF1-3427156-2
NY\1558715.7

IX.
CERTAIN U.S. FEDERAL INCOME
TAX CONSEQUENCES OF THE PLAN

TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSES OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE UNITED STATES INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to Holders of Allowed Prepetition Term Loan Credit Facility Claims, Holders of Allowed Subordinated Notes Claims, Holders of Allowed General Unsecured Claims and the Debtor. This summary is based on the IRC, the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. No rulings or determinations of the IRS or any other taxing authorities have been sought or obtained with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not apply to Holders of Claims that are not "U.S. persons" (as such phrase is defined in the IRC) and does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor or to such Holders in light of their individual circumstances. This discussion is limited to Holders of Allowed Prepetition Term Loan Credit Facility Claims and Holders of Allowed Subordinated Notes Claims who have held their interests in the Prepetition Term Loan Credit Facility and/or the Subordinated Notes being exchanged as capital assets, and who will hold interests in the Term Loan Exit Facility and/or the New Stock as capital assets within the meaning of Section 1221 of the IRC. This discussion does not address tax issues with respect to Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies and regulated investment companies and those holding the New Stock as part of a hedge, straddle, conversion or constructive sale transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.

THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM. ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.

54

A.    **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF ALLOWED PREPETITION TERM LOAN CREDIT FACILITY CLAIMS, HOLDERS OF ALLOWED SUBORDINATED NOTES CLAIMS AND HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS**

    1.    **Gain or Loss**

        (a)    <u>Holders of Allowed Prepetition Term Loan Credit Facility Claims</u>

Pursuant to the Plan, Allowed Prepetition Term Loan Credit Facility Claims will be exchanged for (i) interests in the Term Loan Exit Facility and (ii) the Prepetition Term Loan Payment Amount (collectively, the "**Class 4 Consideration**"). The U.S. federal income tax consequences to Holders of such Allowed Claims depend in part on whether (a) interests in the Prepetition Term Loan Credit Facility are treated as "securities" of the Debtor for purposes of the reorganization provisions of the IRC and (b) interests in the Term Loan Exit Facility are treated as "securities" of the Debtor for purposes of the reorganization provisions of the IRC.

Whether an instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the term of a debt instrument at issuance is an important factor in determining whether such an instrument is a security for U.S. federal income tax purposes. These authorities have indicated that corporate debt instruments with maturities when issued of less than five years generally are not considered securities, and corporate debt instruments with maturities when issued of ten years or more generally are considered securities. The Debtor intends to take the position that the Prepetition Term Loan Credit Facility does not constitute a security for these purposes and that, therefore, the exchange of Allowed Prepetition Term Loan Credit Facility Claims for the Class 4 Consideration will not qualify as a reorganization for U.S. federal income tax purposes.

Assuming that the Debtor's position is respected, a Holder of Allowed Prepetition Term Loan Credit Facility Claims will be treated as exchanging its Allowed Prepetition Term Loan Credit Facility Claims in a taxable exchange under section 1001 of the IRC. Accordingly, each Holder of such Allowed Claims should recognize gain or loss (except as described below under "Distributions in Discharge of Accrued Interest") equal to the difference between: (a) the Holder's adjusted basis, if any, in the Allowed Prepetition Term Loan Credit Facility Claims and (b) the sum of (i) the issue price of the interests in the Term Loan Exit Facility received by such Holder and (ii) the amount of cash received by such Holder. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Holder has a holding period for the Allowed Prepetition Term Loan Credit Facility Claims of more than one year. To the extent that a portion of the consideration received in exchange for the Allowed Claims is allocable to accrued but unpaid interest, the Holder may recognize ordinary income (as discussed in greater detail below). A Holder's tax basis in its interests in the Term Loan Exit Facility should equal the issue price of the interests in the Term Loan Exit Facility received by such Holder. A Holder's holding period for interests in the Term Loan Exit Facility should begin on the day following the Effective Date. Although the matter is not free from doubt, the Debtor believes that the issue price of the Term Loan Exit Facility should equal its stated principal amount.

If, contrary to the Debtor's position, interests in both the Prepetition Term Loan Credit Facility and the Term Loan Exit Facility are treated as securities of the Debtor for purposes of the reorganization provisions of the IRC, then the exchange of Allowed Prepetition Term Loan Credit Facility Claims for the Class 4 Consideration, should qualify as a reorganization for U.S. federal income tax purposes. In such case, a Holder of each such Allowed Prepetition Term Loan Credit Facility Claim should recognize gain, but not loss, with respect to each such Allowed Claim surrendered in an amount equal to the lesser of (x) the amount of gain realized and (y) the amount of cash received by such Holder. Unless the receipt of cash has the effect of the distribution of a dividend, and subject to the "market discount" rules discussed below, such gain or loss should be capital in nature and should be long-term capital gain or loss if the Holder has a holding period for such Allowed Prepetition Term Loan Credit Facility Claims of more than one year.

If, contrary to the Debtor's expectation, the principal amount of the Term Loan Exit Facility exceeds its "issue price" by more than a *de minimis* amount, the Term Loan Exit Facility may be treated as being issued with original issue discount ("OID"), requiring each holder of interests in the Term Loan Exit Facility (whether on a cash method or accrual method of accounting) to accrue such OID daily on a constant yield basis.

(b)    Holders of Allowed Subordinated Notes Claims

Pursuant to the Plan, Holders of Allowed Subordinated Notes Claims will receive, in exchange for their Allowed Subordinated Notes Claims, New Stock. The U.S. federal income tax consequences to Holders of such Allowed Claims depend in part on whether the Subordinated Notes are treated as "securities" of the Debtor for purposes of the reorganization provisions of the IRC.

Whether an instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that term-length of a debt instrument at issuance is an important factor in determining whether such an instrument is a security for U.S. federal income tax purposes. These authorities have indicated that corporate debt instruments with maturities when issued of less than five years generally are not considered securities, and corporate debt instruments with maturities when issued of ten years or more generally are considered securities. The status of corporate debt instruments with maturities of between five and ten years is less clear. The Debtor intends to take the position that the Subordinated Notes constitute securities for these purposes and that, therefore, the exchange of Allowed Subordinated Notes Claims for the New Stock will qualify as a reorganization for U.S. federal income tax purposes.

Assuming that the Debtor's position is respected, Holders of Allowed Subordinated Notes Claims generally should not recognize any gain or loss on the exchange of such Allowed Claims for their Pro Rata share of the New Stock (except to the extent the New Stock is attributable to accrued but unpaid interest on such Allowed Claims, as discussed below). A Holder's initial tax basis in the New Stock received in satisfaction of its Allowed Subordinated Notes Claim will be equal to such Holder's adjusted tax basis in such Allowed Claim exchanged therefor. In general, the Holder's holding period for the New Stock received will include the Holder's holding period for the Allowed Subordinated Notes Claim exchanged therefor. To the extent that New Stock is issued in respect of accrued but unpaid interest on the Subordinated Notes, the basis and holding period for such New Stock is described in "Distributions in Discharge of Accrued Interest," below.

(c)    Holders of Allowed General Unsecured Claims

Pursuant to the Plan, each Holder of an Allowed General Unsecured Claim will receive, in exchange for its Allowed General Unsecured Claim, either (i) such Holder's Pro Rata share of the General Unsecured Claims Cash Amount or (ii) such other less favorable treatment as to which the Debtor or Reorganized Debtor and the Holder of such Claim shall have agreed upon in writing. Holders of such Allowed Claims who receive Cash pursuant to clause (i) of the preceding sentence will recognize gain or loss depending upon the difference (if any) between the amount of Cash to be received in respect of such Allowed Claim (excluding any Cash attributable to accrued and unpaid interest, as discussed below under "Distributions in Discharge of Accrued Interest") and the Holder's tax basis in the Allowed Claim, according to the Holder's method of accounting for U.S. federal income tax purposes. Such gain or loss should constitute ordinary gain or loss, unless the Holder held its Allowed General Unsecured Claim as a capital asset within the meaning of Section 1221 of the IRC, in which such gain or loss will be capital gain or loss. This discussion does not address the U.S. federal income tax treatment of Holders of Allowed General Unsecured Claims who receive consideration in exchange for such Claims as described in clause (ii) in the first sentence of this paragraph. The tax consequences of such an exchange would depend on the amount and type of consideration received by such Holder.

2.    **Distributions in Discharge of Accrued Interest**

In general, to the extent any consideration received pursuant to the Plan by a Holder of an Allowed Claim is allocable to accrued but unpaid interest or accrued OID (accrued during such Holder's holding period), such amount will be taxable to the Holder as ordinary interest income (if not previously included in the Holder's gross income). Conversely, a Holder generally will recognize a deductible loss to the extent any such accrued but unpaid interest or OID was previously included in its gross income and is not paid in full.

Pursuant to the Plan, all distributions in respect of Allowed Claims will be treated as allocated first to the principal amount of such Allowed Claims, with any excess allocated to any unpaid accrued interest. However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes. If the IRS were to determine that such distributions should be allocated first to accrued but unpaid interest, a Holder of

56

Allowed Claims would be required to recognize ordinary interest income (if not previously included in the Holder's gross income) equal to the lesser of (i) the accrued but unpaid interest and (ii) the fair market value of the consideration received that is allocated to interest accrued on the discharged obligation during such Holder's holding period with respect to such Allowed Claim. To the extent interests in the Term Loan Exit Facility or New Stock are treated as being issued for accrued interest, a Holder will have a new holding period with regard to such interests in the Term Loan Exit Facility or New Stock, as applicable, and will have an initial tax basis equal to the fair market value of such interests in the Term Loan Exit Facility or New Stock, as applicable.

3.      **Market Discount**

If a Holder acquired its interests in the Prepetition Term Loan Credit Facility or the Subordinated Notes with market discount, any gain recognized by a Holder on the taxable exchange of an Allowed Prepetition Term Loan Credit Facility Claim or Allowed Subordinated Notes Claim will be treated as ordinary income to the extent of the market discount that accrued thereon during the Holder's holding period for such Allowed Claim, unless the Holder elected to include the market discount in income as it accrued. In general, an Allowed Claim will be treated as having been acquired with market discount if the stated redemption price at maturity of the Allowed Claim (or the revised issue price of the Allowed Claim, in the event that the Allowed Claim is a debt instrument that was issued with OID) exceeded the Holder's initial tax basis in such Allowed Claim by more than a specified *de minimis* amount.

To the extent that interests in the Prepetition Term Loan Credit Facility or the Subordinated Notes that were acquired with market discount are exchanged in a tax-free reorganization for U.S. federal income tax purposes, any market discount that accrued on the Allowed Claims (*i.e.*, up to the time of the exchange) but was not recognized by the Holder upon the exchange should be carried over to (i) the interests in the Term Loan Exit Facility received therefor or (ii) the Post-Effective Date Equity Interests received pursuant to the First Contribution in exchange for New Stock received therefor, as applicable. Any gain recognized on the subsequent sale, exchange, redemption or other disposition of such interests in the Term Loan Exit Facility or Post-Effective Date Equity Interest is treated as ordinary income to the extent of such accrued market discount. In addition, if the exchange of Allowed Prepetition Term Loan Credit Facility Claims for the Class 4 Consideration qualifies as a reorganization, then interests in the Term Loan Exit Facility received by a Holder in exchange for interests in the Prepetition Term Loan Credit Facility that were acquired at a market discount will also be treated as acquired at a market discount if the issue price of the Holder's interests in the Term Loan Exit Facility exceeds the Holder's initial tax basis for such interests by more than a *de minimis* amount. The rules regarding market discount are complex and highly detailed and therefore application of such rules to a Holder that acquired interests in the Prepetition Term Loan Credit Facility or Subordinated Notes with market discount will depend on such Holder's individual circumstances.

4.      **Exchange of New Stock for Post-Effective Date Equity Interests**

The exchange of New Stock for Post-Effective Date Equity Interests pursuant to the First Contribution should not be a taxable exchange for U.S. federal income tax purposes, and, immediately following the exchange, a Holder should have the same adjusted tax basis and holding period in the Post-Effective Date Equity Interests received upon the exchange as the Holder had in the New Stock exchanged therefor.

5.      **Subsequent Sale of Post-Effective Date Equity Interests Received Pursuant to the First Contribution**

Any gain recognized by a Holder of Post-Effective Date Equity Interests upon a subsequent taxable disposition of such Post-Effective Date Equity Interests received pursuant to the First Contribution in exchange for New Stock received in satisfaction of an Allowed Subordinated Notes Claim (or any stock or other property received for such Post-Effective Date Equity Interests in a later tax-free exchange) should be treated as ordinary income to the extent of any bad debt deductions (or additions to a bad debt reserve) claimed with respect to such Subordinated Notes and any ordinary loss deduction incurred less any income (other than interest income) recognized by the Holder upon satisfaction of such Holder's Allowed Subordinated Notes Claim. In addition, any gain recognized by a cash method Holder should be treated as ordinary income to the extent of the amount which was not previously included in the Holder's income due to the Holder's method of accounting but which would have been included if the Allowed Claim tendered in exchange for such New Stock had been paid in full.

57

See above under "Market Discount" for a discussion of the consequences to a Holder disposing of Post-Effective Date Equity Interests received pursuant to the First Contribution in exchange for New Stock received in exchange for Subordinated Notes that were acquired with market discount.

6.    **Information Reporting and Backup Withholding**

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

The Debtor will withhold all amounts required by law to be withheld from distributions pursuant to the Plan. The Debtor will comply with all applicable reporting requirements of the IRS.

**B.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO REORGANIZED DEBTOR**

The Debtor expects to report a net operating loss ("**NOL**") carryforward for federal income tax purposes of approximately $142 million for its taxable year ended December 31, 2008 and expects to incur approximately $30 million of additional NOLs during its current taxable year. The amount of such NOLs and NOL carryforwards remains subject to adjustment by the IRS. The Debtor has not yet determined whether its NOL carryforwards or existing NOLs are currently subject to any limitations as a result of any prior ownership change pursuant to Section 382 of the IRC. In general, when NOLs are subject to more than one IRC Section 382 annual limitation under Section 382 of the IRC, the lowest annual limitation applies.

As discussed below, the amount of such NOLs and NOL carryforwards (and possibly certain other tax attributes of the Debtor) may be significantly reduced or eliminated upon the implementation of the Plan. In addition, the subsequent utilization of any remaining NOLs and NOL carryforwards (and possibly certain other tax attributes) may be restricted upon the implementation of the Plan.

1.    **Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a debtor will realize and recognize cancellation of indebtedness ("**COD**") income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD income, in general, is equal to the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, (y) the stated principal amount of debt that is not publicly traded nor deemed exchanged for publicly traded property and (z) the fair market value of any new consideration (other than debt described in clause (y) above) given in satisfaction of such indebtedness at the time of the exchange.

Under Section 108 of the IRC, a taxpayer may exclude COD income from gross income if the discharge occurs in a case brought under Title 11 of the Bankruptcy Code, provided the taxpayer is under the jurisdiction of a court in such case and the cancellation of indebtedness is granted by the court or is pursuant to a plan approved by the court.

Generally, any COD income excluded from a debtor's gross income under Section 108 of the IRC must be applied against and reduce certain tax attributes of the taxpayer. Unless the taxpayer elects to have such reduction apply first against the basis of its depreciable property, such reduction is first applied against NOLs (including NOLs from the taxable year of discharge and any NOL carryover to such taxable year), and then to certain tax credits, capital loss and capital loss carryovers, tax basis and foreign tax credits.

58

It is expected that the Debtor will realize a significant amount of COD income as a result of the implementation of the Plan. However, because the Plan provides that Holders of Allowed Subordinated Notes Claims will receive New Stock, the amount of COD income and, accordingly, the amount of tax attributes required to be reduced, will depend on the fair market value of the New Stock exchanged therefor. This value cannot be known with certainty until after the Effective Date. In addition, the amount of COD income recognized by the Debtor will depend on whether either or both of the Prepetition Term Loan Credit Facility or the Term Loan Exit Facility are "publicly traded" for U.S. federal income tax purposes.

Because the Debtor will be under the jurisdiction of a court in a bankruptcy case at the time that it realizes the COD income, the Debtor will not be required to include such COD income in gross income. However, since such excluded COD income must be applied against NOLs (or other attributes), the Debtor anticipates that its NOL will be substantially reduced. Any such reduction in tax attributes does not effectively occur until the first day of the taxable year following the year in which the discharge of indebtedness occurs.

## 2.    Limitations on NOL Carryforwards and Other Tax Attributes

Following the implementation of the Plan, any NOLs (and carryforwards thereof) and certain other tax attributes of the Debtor allocable to periods prior to the Effective Date, remaining after the reduction described above, will be subject to the limitations imposed by Section 382 of the IRC.

Under Section 382, if a corporation with NOLs (a "loss corporation") undergoes an "ownership change," the amount of its pre-change NOLs that may be utilized to offset future taxable income is, in general, subject to an annual limitation equal to the product of the applicable long-term-tax-exempt rate (the highest of the adjusted Federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the change date occurs) and the value of the loss corporation (the "**Section 382 Limitation**"). In general, subject to the discussion below regarding ownership changes that occur pursuant to a Title 11 bankruptcy case for purposes of calculating the Section 382 Limitation, the value of the loss corporation is the value of the stock of the loss corporation immediately before the ownership change (with certain adjustments). The Section 382 Limitation does not limit the use of NOLs to offset taxable income allocable to the pre-ownership change portion of the taxable year in which the ownership change occurs. Except as discussed below, if a loss corporation does not continue its historic business or use a significant portion of its business assets in a new business for two years after the ownership change, the annual limitation would be zero.

The Section 382 Limitation may also apply to certain losses or deductions which are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change and that are subsequently recognized. If a loss corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and all items of "built-in" income and deductions), then any built-in losses recognized during the following five years (up to the amount of the original net built-in loss) generally will be treated as a pre-change loss and similarly will be subject to the Section 382 Limitation. Conversely, if the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net built-in gain) generally will increase the Section 382 Limitation, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. In general, a loss corporation's net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. Based on the estimated enterprise value of the Debtor, the Debtor currently anticipates that it will be in a net unrealized built-in gain position on the Effective Date.

It is expected that the issuance of New Stock pursuant to the Plan will constitute an ownership change of the Debtor. However, an exception from application of the Section 382 Limitation is available for loss corporations undergoing an ownership change pursuant to a Title 11 bankruptcy case (the "**Bankruptcy Exception**"). The Bankruptcy Exception is available when shareholders and creditors of the loss corporation before the ownership change own at least 50% (by voting power and by value) of the loss corporation after the ownership change. In general, for purposes of the 50% ownership test, stock transferred to a creditor is only taken into account if it was transferred to the creditor in satisfaction of indebtedness and such indebtedness either (i) was held by the creditor for at least 18 months prior to the filing of the bankruptcy petition or (ii) arose in the ordinary course of business of the loss corporation and was held by the same creditor since it arose. If the Bankruptcy Exception applies, the loss

corporation's NOLs and tax credits that can be carried forward to a post-ownership change year are not subject to the Section 382 Limitation, but instead must be reduced by any deductions allowed for interest paid or accrued, during any taxable year ending during the three years preceding the year of the reorganization and during the pre-ownership change portion of the year of reorganization, on debt converted into stock pursuant to the bankruptcy reorganization.  Further, there is no requirement under the Bankruptcy Exception for the taxpayer to continue its historic business.  However, any further ownership change of the taxpayer within a two-year period after the ownership change will preclude the utilization of any pre-change losses at the time of the subsequent ownership change against future taxable income.

The Debtor has not determined whether it will qualify for the Bankruptcy Exception.  Even if the Debtor qualifies for the Bankruptcy Exception, it may elect out of the Bankruptcy Exception.  If so, a special rule under Section 382 applicable to corporations that are under the jurisdiction of a bankruptcy court but are not subject to the Bankruptcy Exception will apply.  Under this special rule, the value of the loss corporation for purposes of computing the Section 382 Limitation generally is equal to the lesser of (i) the value of the stock of the loss corporation immediately after the ownership change (with certain adjustments) or (ii) the value of the loss corporation's pre-change assets (determined without regard to liabilities).

### 3.      Alternative Minimum Tax

A corporation may incur alternative minimum tax liability even in the case that NOL carryovers and other tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax.  It is possible that the Debtor may be liable for the alternative minimum tax.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN MANY CASES UNCERTAIN.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.**

RLF1-3427156-2
NY\1558715.7

## RECOMMENDATION

In the opinion of the Debtor, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtor's creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan.  Accordingly, the Debtor recommends that Holders of Claims entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

/s/ Edward J. Puisis
_____

Dayton Superior Corporation

By:        Edward J. Puisis

Title:     Vice President and Chief Financial Officer

Dated:   August 25, 2009

Prepared by:

**LATHAM & WATKINS LLP**
Keith A. Simon
Jude M. Gorman
Joseph S. Fabiani
885 Third Avenue
New York, New York 10022–4834
Telephone:        (212) 906–1200
Facsimile:         (212) 751–4864

                         - and -

**RICHARDS, LAYTON & FINGER, P.A.**
Russell C. Silberglied (No. 3462)
John H. Knight (No. 3848)
Paul N. Heath (Bar No. 3704)
Lee E. Kaufman (Bar No. 4877)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:        (302) 651-7700
Facsimile:         (302) 651-7701

*Co-Counsel for the Debtor and Debtor in Possession*